1996 SD 82

CITY OF WATERTOWN, South Dakota, Plaintiff and Appellee,

v.

DAKOTA, MINNESOTA & EASTERN RAILROAD COMPANY; and Chicago, Northwestern Transportation Company, Defendants,

and

Steven T. Horning, P.C., Defendant and Appellant.

Nos. 19421, 19447.

Supreme Court of South Dakota.

Considered on Briefs May 23, 1996.

Decided July 2, 1996.

Vincent A. Foley of Foley Law Office, Watertown, for plaintiff and appellee.

John C. Wiles of Wiles, Rylance & Holgerson, Watertown, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1] Steven T. Horning, P.C. appeals from the circuit court's determination of the City of Watertown's (City's) rights in a declaratory judgment action which addressed a license agreement between City and the Chicago, Northwestern Transportation Co. (CNW). We affirm.

## FACTS AND PROCEDURE

[¶ 2] On April 27, 1977, Western Minnesota Municipal Power Agency (Western Minnesota) entered into an agreement entitled the Watertown Peaking Plant Project Agree-

ment (Agreement) with Missouri Basin Municipal Power Agency (Missouri Basin) to construct, operate, and maintain a combustion turbine power plant and related property, facilities, and structures, in the City of Watertown. Missouri Basin was authorized by Western Minnesota to secure the land, rights-of-way, easements, properties, facilities, and structures necessary for completion of the project.

[¶ 3] The City leased the land upon which the plant was to be constructed to Missouri Basin on September 30, 1977. This lease was to continue until the year 2066 and included an easement for an underground oil pipeline to be installed on an old right-of-way of the CNW railroad line in the City. The pipeline was installed, extending the Williams pipeline to the plant site.

[¶ 4] R.W. Beck and Associates (Beck) were consulting engineers to both Western Minnesota and Missouri Basin on the project and assisted in the design and obtaining the necessary permits for construction, including a license from CNW, before the underground pipeline could be installed. In February 1977, CNW wrote to Beck outlining the pipeline licensing information for Beck's reference. The letter stated, in part, as follows:

A license is required to work before work can be done on transportation company property. It normally takes 30–60 days to obtain a fully executed license. Our minimum license exhibit preparation fee is $75. All rental fees are determined in our Chicago office after receipt of location plans and length of occupation. The fee can be a one-time charge on a non-cancelable license or an annual charge, as preferred by licensee.

[¶ 5] In May 1977, CNW's senior lease agent recommended an annual license charge of $1,000, or a one-time charge of $10,000, at the licensee's election. In August 1977, City's attorney, Ross H. Oviatt, wrote to CNW suggesting changes in the license. Among other modifications, paragraph eight of CNW's standard agreement was modified to reflect the following (lined text denotes the stricken language):

The Company shall have the right at any time to revoke this license by giving thirty days' notice in writing to the Licensee and at the expiration of the time limited by said notice, or Upon any other revocation of this license, the Licensee shall promptly, and in the manner directed by said Chief Engineer, remove all construction hereby authorized from the premises of the Company and leave said premises in the same condition in which they were before the installation of the same. Upon default of the Licensee so to do, the Company may remove the same and restore its premises, and the Licensee will promptly pay to the Company the cost of doing so.

The agreement also provided that

The foregoing license is given upon such express terms and conditions as are inserted below, as well as those contained upon the subsequent printed pages, and should the Licensee at any time violate any of said terms or conditions, or use or attempt to use said facility for any other or different purpose than that above specified, then the Company may, at its option, immediately revoke this license.

The language of the agreement continued that "[i]t is understood and agreed that if the Licensee shall ever discontinue use of said facility for the purpose licensed that this license shall terminate forthwith." City paid the $75 license preparation fee and the $10,000 license fee, and on August 24, 1977, License # 95804 was executed by CNW for the Municipal Utility Board of the City, for the construction, maintenance and use of an oil pipeline adjacent to CNW's railroad line.

[¶ 6] On July 2, 1986, CNW entered into an Asset Purchase Agreement with Dakota, Minnesota & Eastern Railroad Company (DME). In September 1986, CNW and DME entered into an Assignment and Assumption Agreement in which DME agreed to purchase certain of CNW's properties and interests. Although the transferred property did not include License # 95804, on September 8, 1995, at Horning's request, this license was assigned by CNW to DME and the transfer ratified.

[¶ 7] In 1993, the CNW right-of-way was advertised for sale. On January 19, 1994, Horning offered to purchase the right-of-way

from DME for $88,000, with a $7,500 down payment. Horning was unaware of the existence of License # 95804 at this time, but received a copy of the license on February 25, 1994. The closing date was set for December 31, 1994, but this date was extended to April 1, 1995 at Horning's request so the issue of the license agreement could be determined prior to closing. The City's position was that the license was only revocable on conditions set forth in the license itself. Horning claimed he is entitled to a reduction of the purchase price if City's position was upheld. The sale closed in July 1995, with Horning taking the property by quit-claim deed. When Horning closed on the property, he received it subject to the license agreement with City.

[¶ 8] Horning notified City of his intent to terminate the license upon his acquisition of the property. City brought a declaratory judgment action pursuant to SDCL 21–24–3 for a determination of its rights under the license agreement. This action was brought against DME, CNW, and Horning. CNW was dismissed from the action pursuant to a stipulation of the parties. The parties further stipulated to certain documentary and deposition evidence which was received by the trial court.

[¶ 9] The trial court requested additional evidence relating to the assignment from CNW to DME. The trial court found that, following a series of deeds of conveyance and assignments, Horning had succeeded to CNW's interest in the license and had all rights and obligations of CNW as the original licensor. The trial court concluded that the language of License # 95804 was clear and unambiguous, and that the license was revocable only upon the occurrence of conditions listed within the document itself. The trial court also concluded that if parol evidence were considered, the result would be the same.

[¶ 10] Horning appeals the trial court's determination, raising the following issues:

1) Whether the trial court correctly interpreted License # 95804?

2) Whether the trial court erred by admitting parol evidence?

City raises the following issue by notice of review:

3) Whether the trial court erred by failing to rule on the nonexistence of any defaults by City?

DME is not a party to the appeal.

## STANDARD OF REVIEW

[¶ 11] We review all findings based on documentary and deposition evidence de novo. *First National Bank v. Bank of Lemmon*, 535 N.W.2d 866, 871 (S.D.1995). Interpretation of a written license agreement, just as a contract, is reviewed de novo. *Dirks v. Sioux Valley Empire Elec. Ass'n.*, 450 N.W.2d 426, 427–28 (S.D.1990).

## ANALYSIS AND DECISION

[¶ 12] 1) **Whether the trial court correctly interpreted License # 95804?**

[¶ 13] A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct. *Baker v. Wilburn*, 456 N.W.2d 304, 306 (S.D.1990). Our review of License # 95804 convinces us that the document is plain and unambiguous. The Court is to enforce and give effect to the unambiguous language and terms of the contract. *Id.* (citing *GMS, Inc. v. Deadwood Social Club, Inc.*, 333 N.W.2d 442 (S.D. 1983)).

[¶ 14] Horning agrees with the trial court's determination that the license is plain and unambiguous. However, Horning disagrees with the trial court's interpretation that the license is not revocable at will. Specifically, Horning claims the trial court erred by failing to consider paragraphs seven and eight of the license, set forth below in pertinent part:

¶ 7 The Company [now Horning] reserves the right to use, occupy and enjoy its tracks, property and right of way, for such purpose, in such manner, and at such time as it shall desire, the same as if this instrument had not been executed by it. If any such use shall necessitate any change, repair, renewal, removal or relocation of said facility, or any part thereof, the Licensee

[City] shall perform such work at such time as the Company may approve....

¶ 8 ~~The Company shall have the right at any time to revoke this license by giving thirty days' notice in writing to the Licensee and at the expiration of the time limited by said notice, or~~ Upon any ~~other~~ revocation of this license, the Licensee shall promptly, and in the manner directed by said Chief Engineer, remove all construction hereby authorized from the premises of the Company and leave said premises in the same condition in which they were before the installation of the same. Upon default of the Licensee so to do, the Company may remove the same and restore its premises, and the Licensee will promptly pay to the Company the cost of doing so.

[¶ 15] Horning claims that had the trial court properly considered these paragraphs, it would have reached the conclusion that the licensor reserved the right of use of the property for any purpose it desires and that the stricken language contemplates revocation upon reasonable notice, rather than within thirty days. Horning claims further support for the Company's, now his, reservation of use rights in paragraph twelve of the license which provides: "Licensee further agrees that there is no benefit to the Company's properties, either for railroad use or for any possible use in the future, from the construction of the facility or project of which said facility is a part."

[¶ 16] Examining paragraph eight first, we cannot agree with Horning's interpretation that the stricken language merely changed the time limit in which the license could be revoked but did not affect CNW's right to revoke. To accept such an interpretation negates the effect of the parties' striking the following: "The Company shall have the right at any time to revoke this license...." By striking this particular language, the parties intended to remove this right of revocation under CNW's standard written agreement. If the intent of the parties were as Horning suggests, the above language would not have been stricken and the only change required would have been to strike "by giving thirty days' notice" and substitute "by giving reasonable notice." The fact that the

parties deleted more language than necessary to effect Horning's interpretation leads us to conclude his interpretation of the parties' intent is erroneous.

■ [¶ 17] The parties' intent is also demonstrated by their actions in making the agreement. *Hammerquist v. Warburton*, 458 N.W.2d 773, 777 (S.D.1990); *Haggar v. Olfert*, 387 N.W.2d 45, 50 (S.D.1986). City suggested the above modification in CNW's standard agreement knowing City planned to construct and maintain an oil pipeline on the property, a costly and long-term undertaking. City elected to pay the one-time license fee of $10,000 rather than the $1,000 annual fee. The land upon which the power plant is constructed, and to which the pipeline is attached, is leased until the year 2066. The pipeline represents the only source of fuel to this plant. All of this suggests a sense of permanence which does not comport with the notion that City would enter into an agreement that would grant CNW the right to terminate it at any time with written notice, whether given within thirty days or some other reasonable period of time.

■ [¶ 18] A contract is to be examined as a whole and all provisions read together to construe the contract's meaning. *Baker*, 456 N.W.2d at 306; *Northwestern Publ. Serv. Co. v. Chicago & Northwestern Rwy. Co.*, 87 S.D. 480, 210 N.W.2d 158, 160 (1973); *Eberle v. McKeown*, 83 S.D. 345, 159 N.W.2d 391, 393 (1968). As to paragraph seven of the license and the right to use reserved by CNW, we find that were CNW as licensor permitted to effect a constructive revocation merely by changing its use of the property, the licensee could no longer enjoy the use of the license. This would render as surplusage the express conditions cited within the license which trigger revocation. Under an interpretation such as Horning's, the parties' written agreement would be worthless to the licensee because the licensor could change its use of the property at any time such that the licensee could not make use of the agreement. Surely, the City would not spend thousands of dollars on the license fee and undertake the considerable time and expense required for constructing an oil pipeline for a license agreement that could be so summarily termi-

nated. Also, in examining the agreement as a whole, we note that paragraph six provides "[i]t is understood by the Licensee that said facility is subject to and may increase the dangers and hazards of the operation of the railroad of the Company. . . ." This long-term language on Company's use of the property gave City some sense of assurance as to the stability of its own usage prior to signing the license agreement and paying CNW its $10,000 fee.

[¶ 19] Finally, we note that further support for the trial court's interpretation of paragraph seven as not permitting a constructive revocation through licensor's change of use is found in the provisions of the license which specifically set forth the method in which the license may be revoked. These terms are located on the license's first page, prior to the conditions set out in enumerated paragraphs on the subsequent pages. The pertinent language reads:

> The foregoing license is given upon such express terms and conditions as are inserted below, as well as those contained upon the subsequent printed pages, and *should Licensee at any time violate any of said terms or conditions, or use or attempt to use said facility for any other or different purpose than that above specified, then the Company may, at its option, immediately revoke this license.*

(emphasis added). The above language is printed on the form. The express terms and conditions "inserted below" are typed onto the form and are as follows:

> For the privileges herein permitted the Licensee shall pay to the Company the sum of Ten Thousand Dollars ($10,000.00). *It is understood and agreed that if the Licensee shall ever discontinue use of said facility for the purpose licensed that this license shall terminate forthwith.*

(emphasis added). Generally, a license is revocable at the will of the licensor. *Hector v. Metro Centers, Inc.*, 498 N.W.2d 113, 117 (N.D.1993); *Larson v. Amundson*, 414 N.W.2d 413, 418 (Minn.Ct.App.1987). The above paragraphs, and the stricken portion of paragraph eight, evidence the parties' intent that the licensor in this instance relinquished its right to revoke at will and agreed to revoke only for 1) discontinued use by licensee; 2) change in use by licensee other than for purpose licensed; or 3) violation by licensee of any of the terms or conditions set forth in the agreement itself.

[¶ 20] **2) Whether the trial court erred by admitting parol evidence?**

[¶ 21] Parol evidence is not admissible where the agreement to be interpreted is integrated, unambiguous and the parties' intent clear. *Quick v. Bakke, Kopp, Ballou, & McFarlin, Inc.*, 380 N.W.2d 364, 366 (S.D. 1986); *see* SDCL 53–8–5. Whether a contract is ambiguous is a question of law. *Olsen v. Airheart*, 531 N.W.2d 571, 572 (S.D. 1995). "[A]n ambiguity is not of itself created simply because the parties differ as to the interpretation of the contract." *Johnson v. Johnson*, 291 N.W.2d 776, 778–79 (S.D.1980).

[¶ 22] The trial court found the license agreement to be unambiguous. Horning shares this view. We have reviewed the entire matter de novo and have also found the license to be unambiguous. We therefore do not reach this question. Further, we have previously recognized that where the matter is to be determined by a court, rather than a jury, the presumption is that improperly admitted evidence is disregarded. *State v. Bailey*, 1996 SD 45, ¶ 34, 546 N.W.2d 387, 394 (citing *In re R.S.S.*, 474 N.W.2d 743, 750 (S.D.1991)). "In a trial to the court in which 'admissible evidence supports the findings, [additional] evidence, though inadmissible, is nonprejudicial.'" *R.S.S.*, 474 N.W.2d at 750 (quoting *Achtien v. City of Deadwood*, 408 N.W.2d 756, 758 (S.D.1987)). The trial court found an independent and separate basis on which to rule the license revocable only on the occurrence of certain conditions set forth in the license itself and we affirm on that basis.

[¶ 23] **3) Whether the trial court erred by failing to rule on the nonexistence of any defaults by City?**

[¶ 24] City raised this issue by notice of review, requesting this Court to find City has not violated any of the terms or conditions of the license agreement and, therefore, no cause for revocation exists. Horning did

not respond to City's argument in his reply brief.

[¶ 25] The trial court stated in its memorandum decision dated November 1, 1995, and later incorporated by reference into its findings of fact and conclusions of law, that it offered "no opinion on whether or not grounds exist pursuant to the agreement for revocation of the license." City proposed findings of fact and conclusions of law restating the trial court's opinion in this regard, which the trial court signed without change.

[¶ 26] City offered no objection nor did City propose alternative findings and conclusions which would have supported the position it now proposes on appeal. By not objecting to the trial court's findings and conclusions or submitting alternative findings and conclusions, City failed to preserve this issue for appeal. We have long held that issues not addressed or ruled upon by the trial court will not be addressed by this Court for the first time on appeal. *Keegan v. First Bank,* 519 N.W.2d 607, 615 (S.D.1994); *Fullmer v. State Farm Ins. Co.,* 514 N.W.2d 861, 866 (S.D.1994); *Hawkins v. Peterson,* 474 N.W.2d 90, 95 (S.D.1991); *Bottum v. Herr,* 83 S.D. 542, 548, 162 N.W.2d 880, 883 (1968) (a party "cannot now assert error on matters not considered by or ruled upon in the trial court"); *Schull Constr. Co. v. Koenig,* 80 S.D. 224, 229, 121 N.W.2d 559, 561 (1963) ("A reviewing court will not consider matters not properly before it or matters not determined by the trial court").

[¶ 27] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.