1998 SD 25

**James D. BAD WOUND, Plaintiff and Appellant,**

v.

**LAKOTA COMMUNITY HOMES, INC., Defendant and Appellee.**

**No. 19916.**

Supreme Court of South Dakota.

Argued Sept. 9, 1997.

Decided March 11, 1998.

James D. Leach of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for plaintiff and appellant.

Paul S. Swedlund of Gunderson, Palmer, Goodsell & Nelson, Rapid City, for defendant and appellee.

AMUNDSON, Justice.

[¶1.] James D. Bad Wound's employment with Lakota Community Homes, Inc. (LCH) was terminated on the basis of insubordination and neglect of duty as a result of his failure to appear for work on two successive days. Bad Wound brought suit against LCH alleging breach of contract and wrongful termination. The trial court granted summary judgment for LCH and denied Bad Wound's motion for summary judgment. Bad Wound appeals. We reverse in part and remand for trial.

**FACTS**

[¶2.] LCH is a federally subsidized housing development composed of 198 homes in Rapid City, South Dakota, which are rented to persons with low income. LCH is administered under the authority of the five-member LCH board of directors. The board of directors hired CKJ Realty & Management, Inc. (CKJ) to provide property management services for the LCH development.

[¶3.] James Bad Wound was employed as a maintenance worker for LCH for seventeen years. In August of 1995, Bad Wound was promoted to maintenance supervisor. At the time of this promotion, LCH and Bad Wound entered into a three-year employment agreement, which only allowed LCH to terminate Bad Wound's employment for just cause. Just cause was defined to include insubordination, among other things.

[¶4.] Subsequent to the execution of Bad Wound's employment agreement, the composition of the LCH board of directors was substantially altered when several new board members were elected or appointed on October 26, 1995. The new members of the board were dissatisfied with CKJ's management performance.

[¶5.] After the new board was in place, changes were made quickly and the operation of LCH was thrown into turmoil. On November 1, 1995, the new board acted "to immediately terminate and eradicate" its five-year management agreement with CKJ, even though the agreement required notice and an opportunity to cure any breaches

before termination of the contract. Then, on November 7, the new board hired a new management agent, Medicine Eagle Enterprises, L.L.C., whose on-site manager was Patricia Cromwell.

[¶ 6.] Also on November 7, 1995, Bad Wound had a meeting with the LCH board of directors in which he expressed confusion regarding who had the proper authority over his employment. The LCH board told Bad Wound that he was working for them. However, previous to this, CKJ had sent a memo to the LCH board claiming that all office and maintenance personnel were employees of CKJ and under its supervision. Bad Wound had been working under the authority and supervision of CKJ since he was promoted. Moreover, his supervisor was Jeff Heried, who was employed by CKJ. Bad Wound had also been advised by CKJ that he was under its authority, not the authority of the newly elected board. Jeff Heried told Bad Wound that CKJ's management contract with LCH gave CKJ the power to hire and fire personnel. Furthermore, CKJ management expressed to Bad Wound words to the effect that, if he went to work on November 8, he would be taking his fate into his own hands. Bad Wound stated that he assumed this would mean he would be fired.

[¶ 7.] Subsequently, Bad Wound missed work on November 8 and 9, 1995. November 10 was a holiday and Bad Wound was not scheduled to work on November 11 and 12.

[¶ 8.] On Monday, November 13, Bad Wound showed up for work at LCH. However, shortly after appearing at work, he was provided with a termination letter by Patricia Cromwell. The termination letter advised Bad Wound that he was being terminated for insubordination and neglect of his duties as a result of his failure to appear for work on November 8 and 9, 1995. Bad Wound was removed from his position as maintenance supervisor that day.

[¶ 9.] Bad Wound filed suit against LCH for breach of contract and wrongful termination. Thereafter, the trial court denied Bad Wound's motion for summary judgment and granted LCH's motion for summary judgment, finding that Bad Wound's confusion about who had proper authority over

him was unfounded. The trial court declared Bad Wound should have been able to determine from his employment agreement that he was under the authority of LCH. Finally, the trial court concluded that Bad Wound's failure to appear for work on two successive days was insubordination as a matter of law.

[¶ 10.] Bad Wound appeals the grant of LCH's motion for summary judgment and the denial of his motion for summary judgment, raising the following issues:

I.  Whether the trial court erred when it found as a matter of law that there was "just cause" for Bad Wound's termination on the basis of insubordination.

II. Whether the trial court erred in not finding a genuine issue of material fact as to whether Bad Wound was granted a "formal hearing prior to any final action" as mandated in his employment contract.

III. Whether the trial court erred in not finding a genuine issue of material fact as to whether Bad Wound was entitled to the progressive disciplinary procedures contained in the LCH personnel policy manual.

IV. Whether the trial court erred in denying Bad Wound's motion for summary judgment.

## STANDARD OF REVIEW

[¶ 11.] Our standard of review for summary judgment has been clearly established as follows:

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue

of material fact exists and whether the law was correctly applied....

*Walz v. Fireman's Fund Ins. Co.*, 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70 (quoting *Lamp v. First Nat'l Bank of Garretson*, 496 N.W.2d 581, 583 (S.D.1993)). When reviewing a grant of summary judgment, we must undertake an independent review of the record. *Id.* (citation omitted). "The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *Kern v. City of Sioux Falls*, 1997 SD 19, ¶ 4, 560 N.W.2d 236, 237 (citing *State Dep't of Revenue v. Thiewes*, 448 N.W.2d 1, 2 (S.D.1989)).

[¶ 12.] The construction of a written contract is a question of law for the court to consider. *Dirks v. Sioux Valley Empire Elec. Assn.* 450 N.W.2d 426, 427–28 (S.D. 1990) (citation omitted).

## DECISION

### [¶ 13.] I. "Just Cause" and "Insubordination"

[¶ 14.] After seventeen years of steady employment, Bad Wound was terminated by LCH after missing two days of work. While South Dakota generally adheres to the employment-at-will doctrine, Bad Wound had the benefit of a three-year employment contract with LCH, so the general employment-at-will doctrine of this state was not applicable. *Cf.* SDCL 60–4–4 (stating indefinite employment terminable at will). Under the terms of the employment contract, Bad Wound could only be discharged for "just cause." LCH contends that "just cause" for Bad Wound's termination was his alleged insubordination. "Insubordination" is listed as one of the examples of "just cause" in Bad Wound's employment agreement. The issue then boils down to whether missing two days of work under the circumstances of this case is "just cause" for termination of Bad Wound because it is "insubordination" as a matter of law.

[¶ 15.] The trial court held that there was no genuine issue of material fact as to whether Bad Wound was insubordinate in failing to appear for work on two successive days after having been instructed otherwise by the LCH board. However, viewing the evidence in a light most favorable to Bad Wound reveals that genuine issues of material fact do exist. *See Walz*, 1996 SD 135, ¶ 6, 556 N.W.2d at 70 (holding on review of a grant of summary judgment evidence is viewed most favorably to nonmoving party) (citation omitted).

[¶ 16.] Other courts have dealt with situations similar to the case before us. One case involved the firing of an employee who contended the failure to follow the directions of an employer was based on confusion, not insubordination, and involved a factual issue as to what the employee understood at the time. *Linear Notions, Inc. v. Johnson*, 941 S.W.2d 1 (Mo.Ct.App.1997). The court affirmed the factual determination that the employee was not guilty of misconduct, but rather was simply confused. *Id.* at 4. Furthermore, the Supreme Court of Rhode Island addressed a situation in which an employee was dismissed for insubordination because of the employee's absence for a day from work without leave. *McKinnon v. Housing Auth.*, 114 R.I. 686, 338 A.2d 517 (R.I.1975). The court concluded that the absence was not "the kind of intentional opposition to authority upon which a finding of 'insubordination' must rest." *Id.* at 519. In like manner, Bad Wound's alleged confusion as to who was the proper authority for him to follow may be what triggered his absence, not some "kind of intentional opposition." This determination as to Bad Wound obviously involves issues of credibility and fact that need to be resolved by a jury.

[¶ 17.] LCH looks to *Schroeder v. Dept. of Social Services*, 1996 SD 34, 545 N.W.2d 223, for support for the grant of summary judgment in this case. However, in *Schroeder*, this Court reviewed findings of fact. *Id.*, ¶ 10, 545 N.W.2d at 228. The findings revealed the following examples of Schroeder's conduct: "[S]he angrily yelled at her supervisor; she was verbally abusive to others; she conducted an unauthorized community survey; and she disobeyed her supervisor's directive about involving other employees in the ongoing inter-office controversy." *Id.*,

¶ 7, 545 N.W.2d at 227. In contrast to *Schroeder*, there were no findings of fact made in this case, so the factual matters in dispute have remained in dispute.

[¶ 18.] We previously set out one definition of insubordination, in *Schroeder*, as "not submitting to authority; disobedient." *Id.*, ¶ 10, 545 N.W.2d at 228. However, in *Schroeder*, there was no question of who the proper authority was. The employer did not put an agent between itself and the employee, as in the current case. The employer also did not hand over control of its employees to an agent who "hired, paid, supervised, and discharged" its employees in place of the employer, as in the current case. In short, Schroeder knew who the proper authorities were for her to follow, but she chose to disobey them. In contrast, Bad Wound's alleged confusion—as opposed to a conscience decision to disobey his employer—may explain his failure to appear for work.

[¶ 19.] Bad Wound's evidence, viewed most favorably to him, shows that he was placed in the unenviable position of determining whether to follow the orders of CKJ or to follow the orders of LCH's board during this tumultuous time. In either case, he risked being fired. Whether Bad Wound was genuinely not sure which entity had the proper authority over him because of the way LCH set up the employment relationship is an issue of fact.

[¶ 20.] LCH's board of directors met with Bad Wound and showed him the management agreement that LCH had with CKJ. LCH claims this agreement should have made it clear to Bad Wound that he was bound to follow their orders rather than CKJ's. However, the management agreement puts the agent in charge of much of the employee-employer relationship. The management agreement, in pertinent part, states the following in section twelve:

**Employees.** The Agent will prescribe the number, qualifications and duties of the personnel to be regularly employed in the management of the Project, including an On–Site Manager, maintenance, bookkeeping, clerical, and other managerial employees. All such on-site personnel will be employees of the Project and not the Agent, but will be *hired, paid, supervised, and discharged through the Agent . ...* (Emphasis supplied.)

Although the contract effectively says Bad Wound is an employee of LCH, this is buried in language giving the agent the power to prescribe the "number, qualifications, and duties" of employees like Bad Wound. Furthermore, employees are "hired, paid, supervised, and discharged through the Agent." Even given the confusion that results from Bad Wound being an employee of LCH, the management agreement clearly gives to CKJ the right to supervise and direct the employee.

[¶ 21.] Bad Wound could have chosen to disobey the orders of CKJ and Jeff Heried and gone to work on November 8 and 9. However, Heried had been his immediate supervisor, and CKJ had the power to fire him according to the management agreement. Moreover, Bad Wound claims that Heried had made it clear to him that he would be fired if he showed up for work on November 8 or 9. It is true that Bad Wound had signed an employment agreement with the previously constituted LCH board, but he had never worked under their direct supervision. Even further, Bad Wound's employment agreement contained language which placed the agent (CKJ) in a position of authority over Bad Wound. The employment agreement specified the following required duties of Bad Wound:

**DUTIES:** Employee shall perform all duties, services and responsibilities as: Maintenance Supervisor, and other duties as may be prescribed from time to time by the Employer, or its designated agent, or by circumstances.... Employee shall comply with and abide by all rules, regulations, policies, procedures and other agenda of the Employer. **THE EMPLOYER'S AGENT shall enforce compliance.** (Capitalization, bold and underlining in original.)

Given the fact that CKJ was granted this extensive authority by LCH, when CKJ exercises this authority pursuant to past practices of the parties and directs Bad Wound, it creates a jury question as to whether Bad Wound's conduct at this time constituted "in-

subordination." The jury may decide that Bad Wound was merely a pawn which these disputing parties were attempting to manipulate pursuant to their agenda during this conflict between LCH and CKJ. Under the unique facts of this case, there is a genuine issue of material fact as to whether or not missing these two days constitutes "insubordination." We reverse and remand for trial on this issue.

[¶ 22.] Given our holding that there are material facts in dispute, we do not reach the remaining issues at this time.

[¶ 23.] MILLER, C.J., and SABERS, KONENKAMP and GILBERTSON, JJ., concur.