1998 SD 79

Eugene RUMPZA and Melinda Rumpza, Plaintiffs and Appellants,

v.

DONALAR ENTERPRISES, INC., Defendant and Appellant,

and

Stockholm Farm Mutual Insurance Company, Inc., a South Dakota Corporation, Defendant and Appellee.

No. 20133.

Supreme Court of South Dakota.

Argued Feb. 19, 1998.

Reassigned May 22, 1998.

Decided July 15, 1998.

Lee Schoenbeck and Jack Hieb of Schoenbeck Law Office, Webster, for plaintiffs and appellants, Rumpzas.

James E. Moore of Woods, Fuller, Shultz & Smith, Sioux Falls, for defendant and appellant, Donalar Enterprises, Inc.

George Boos and John V. Ohnstad, Jr. of Boos & Ohnstad, Milbank, for defendant and appellee.

GILBERTSON, Justice (on reassignment).

[¶ 1.] Insureds and their agent appeal from summary judgment entered in favor of insurer after the trial court concluded certain policy provisions relating to vacancy were unambiguous and insureds failed to demonstrate insurer had breached insurance contract. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## FACTS AND PROCEDURE

[¶ 2.] We recently detailed the facts underlying this fire insurance case in *Rumpza v. Larsen*, 1996 SD 87, 551 N.W.2d 810, (*Rumpza I* ).

[¶ 3.] Eugene and Melinda Rumpza (Rumpzas) are the owners of several parcels of real estate in the northeastern section of South Dakota. Beginning July 1, 1992, Don Larsen (Larsen) commenced handling Rumpzas' insurance needs. On March 23, 1993, Rumpzas acquired the property at issue which is located near South Shore, South Dakota (South Shore). Larsen stated that prior to the March, 1993 closing on this property, Rumpzas "indicated that there was a house on [South Shore], and the people were still residing in there and would be moving out of that home, and they were going to be making some repairs ... and put it up for rent and also possibly for sale."

[¶ 4.] Rumpza contacted Larsen on April 1, 1993, to insure this property. After the parties determined that $50,000 was the proper amount of coverage, Larsen added the South Shore coverage to an existing policy issued by Stockholm Farm Mutual Insurance Company, Incorporated (Stockholm). Shortly after the policy went into effect, certain improvements to the home were undertaken, Rumpzas listed the property for sale, and secured a renter to take possession of the home effective June 26, 1993. The home on the South Shore property caught fire and was totally destroyed on June 19, 1993.

[¶ 5.] Rumpzas timely notified Stockholm of their loss. Stockholm replied by letter dated July 14, 1993, in which it granted permission for the vacancy after concluding that Larsen's limited knowledge of a potential vacancy constituted "permission" for the vacancy under the policy. Stockholm then paid Rumpzas sixty percent of their loss, less a $500 deductible, for a total of $29,500. Rumpzas informed Stockholm they were seeking the face value of the policy, $50,000. Stockholm's attorney, John Ohnstad, Jr. (Ohnstad), sent Rumpzas a letter dated August 16, 1993, in which he stated his belief that Rumpzas' home "was not vacant when it was insured by Stockholm ... and Mr. Larsen was led to believe that the house would continue to be occupied by someone."

[¶ 6.] Rumpzas filed suit on November 5, 1993, against Larsen and Stockholm claiming Larsen was negligent in failing to advise them of the terms of the vacancy endorsement. The trial court granted summary judgment in favor of Stockholm and Larsen. Rumpzas appealed the decision and we affirmed in part, reversed in part, and remanded. *See Rumpza I, supra.*

[¶ 7.] On remand, the parties stipulated to the substitution of Donalar Enterprises, Inc. (Donalar), owner of Dakota Agency, for Larsen. Donalar filed a cross claim against Stockholm, contending Stockholm had

breached its contract with Rumpzas. Stockholm filed a cross claim against Donalar, seeking indemnity for any negligence of Larsen. The trial court granted Stockholm's motion for summary judgment based on a finding that the vacancy definition in the contract was not ambiguous and that the facts were not in dispute. Since the trial court found no breach of contract, it denied Rumpzas' motions to amend their complaint to request attorney fees under SDCL 58–12–3, assert a bad-faith claim, and remove Ohnstad as attorney for Stockholm, or strike his affidavit. Additional facts will be provided as necessary to address the following issues brought by Rumpzas:

1. Whether the circuit court erred in granting summary judgment in favor of Stockholm on the breach of contract claim.

2. Whether the circuit court erred in not allowing the Rumpzas to amend their complaint and reassert the claim for willful and vexatious refusal to pay.

3. Whether the circuit court erred in not allowing the Rumpzas to amend their complaint and reassert the bad faith claim.

4. Whether the circuit court erred in failing to remove attorney John Ohnstad as counsel for Stockholm.

[¶ 8.] In addition to the issues raised by the Rumpzas, Donalar raises the following issue:

5. Whether the vacancy endorsement attached to the Rumpzas' policy was invalidated by SDCL 58–10–10.

### STANDARD OF REVIEW

■ [¶ 9.] Our standard of review for summary judgment is well established: In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we determine whether the moving party has demonstrated the absence of

any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving par-

ty. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied[.] *Walz v. Fireman's Fund Ins. Co.,* 1996 SD 135, ¶ 6, 556 N.W.2d 68, 70 (quoting *Lamp v. First Nat'l Bank of Garretson,* 496 N.W.2d 581, 583 (S.D.1993)). When reviewing a grant of summary judgment, we must undertake an independent review of the record. *Id.* (citation omitted). "The burden of proof is upon the movant to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." *Kern v. City of Sioux Falls,* 1997 SD 19, ¶ 4, 560 N.W.2d 236, 237 (citing *State Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989)).

*Bad Wound v. Lakota Community Homes, Inc.,* 1998 SD 25, ¶ 11, 576 N.W.2d 229, 230–31. "The construction of a written contract is a question of law for the court to consider." *Id.* (citation omitted).

### ANALYSIS AND DECISION

[¶ 10.] **1. Whether the circuit court erred in granting summary judgment in favor of Stockholm on the breach of contract claim.**

■ [¶ 11.] We reverse as the policy provision relating to vacancy is ambiguous as applied to the facts of this case. An insurance policy must be examined as a whole. *City of Watertown v. Dakota, Minnesota, & Eastern R.R.,* 1996 SD 82, ¶ 18, 551 N.W.2d 571, 575 (citation omitted). Rumpzas' policy contained the following amendatory endorsement:

### AMENDATORY ENDORSEMENT

This endorsement BROADENS and in some instances RESTRICTS coverages, please read carefully

VACANT PROPERTY:

1. Insured Premises are considered va-

cant, if the property is: [1]

   a.   Not lived in;

   b.   Void of furnishing; or

   c.   Furnished, but not used as a full-time primary residence.

2.   Under policy conditions add number 11 as follows:

> We will not pay for loss while the insured premises is vacant beyond a period of 30 days. If permission has been granted for vacancy, in lieu of increased premium, the amount of coverage will be reduced 40 percent.
>
> In the event of a partial loss during this vacant period, no payment will be made until repairs have been completed.

■■■ [¶ 12.] Construction of a written contract is a question of law which we review de novo. *Bell v. East River Elec. Power Coop., Inc.*, 535 N.W.2d 750, 754 (S.D.1995); *American State Bank v. Adkins*, 458 N.W.2d 807, 809 (S.D.1990); *Dirks v. Sioux Valley Empire Elec. Ass'n, Inc.*, 450 N.W.2d 426, 427–28 (S.D.1990).

> Where the provisions of an insurance policy are fairly susceptible of different interpretations, the interpretation most favorable to the insured should be adopted. This rule of liberal construction in favor of the insured and strictly against the insurer applies only where the language of the insurance contract is ambiguous and susceptible of more than one interpretation.... This rule does not mean, however, that the court may seek out a strained or unusual meaning for the benefit of the insured.

*Olson v. U.S. Fidelity and Guar. Co.*, 1996 SD 66, ¶ 6, 549 N.W.2d 199, 200 (citation and quotations omitted).

[¶ 13.] Rumpzas claim that Stockholm's "entire policy is not contained in the pages of its policy" and that there was an "unwritten term which necessarily must be included to give the contract the meaning Stockholm would assert." Rumpzas allege this "unwritten term" is how Stockholm defines and determines vacancies thus rendering the policy is ambiguous. We agree.

■■■ [¶ 14.] Nowhere in the policy can be found any reference to how Stockholm determines whether property is vacant at the inception of coverage or more importantly how an insured seeking coverage would know he is paying premiums for vacant property. The method for determining vacancy is crucial to give the provision any meaning whatsoever. President Stengel of Stockholm testified that the agent determines vacancy at the procurement stage of the policy and may bind Stockholm with that determination. "An insurer ... may be estopped in reference to the meaning of a particular term in one of its contracts by its own interpretation of that term." Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 21:8 (3d ed.1996) (collecting cases).

■■■ [¶ 15.] Stengel has admitted that the insured has no way of knowing that his property is considered vacant under the policy approved by Stockholm unless the agent notified the insurer. Moreover, in the absence of the agent telling the insured, the insured does not know if he has been quoted and is paying the higher premiums for vacant property or regular premiums for occupied property. Rumpzas maintain they never believed they were paying premiums for anything less than full coverage. Larsen testified that he had been told the property would be unoccupied for a period of *up to 60 days* but did not consider the vacancy exclusion would apply

---

1.  Some confusion exists over whether the above conditions are to be read in the disjunctive or the conjunctive. The circuit court agreed with Stockholm that the conditions constituting vacant property are set forth in the disjunctive so that if one of them applies the property is vacant. The circuit court held the policy clear and unambiguous as a matter of law because the "South Shore property was not lived in, nor was it used as a full-time primary residence." The use of

semi-colons and the word "or" in the conditions set forth above is awkward at best.

> Even Stockholm's President, Stengel, was unsure how to give the section meaning when asked whether each or any one of the conditions have to be met for the property to be considered vacant under the endorsement. He replied, "I guess I don't know how to interpret that."

so he did not request higher premiums or bring the matter to the Rumpzas' attention.[2]

In accord with the principle of interpreting a policy liberally in favor of the insured, in determining whether the use made of premises constituted the contemplated use, it is proper to consider the existing and the preexisting circumstances known to the agent and owner when the policy was issued, as well as the policy itself.

*Couch on Insurance,* § 94:43 (footnotes omitted).

[¶ 16.] Larsen has testified that in his professional opinion, he thought he had procured full coverage from Stockholm. A question of material fact exists as to a breach of contract by Stockholm. As such, we reverse and remand for trial.

[¶ 17.] **2. Whether the circuit court erred in not allowing the Rumpzas to amend their complaint and reassert the claim for willful and vexatious refusal to pay.**

■ [¶ 18.] On November 25, 1996, Rumpzas' requested that the circuit court allow them to amend their complaint and reassert a claim for willful and vexatious refusal to pay.[3] Rumpzas had previously stipulated to a dismissal of the willful and vexatious refusal to pay and bad faith counts. The circuit court denied the motion under SDCL 15–6–60(b) after determining that Rumpzas did not show sufficient cause to amend. The circuit court reasoned that Rumpzas "became aware of a possible basis for the willful and vexatious refusal to pay claim" during the deposition of Stockholm's expert which was held *subsequent* to the stipulation to dismiss. Furthermore, the court believed that during the three-year span of the suit, Rumpzas had an adequate opportunity to "consult any number of insurance experts in their search for a basis for the claim."

[¶ 19.] Rumpzas based their motion to amend upon the discovery of a July 6, 1993, taped conversation which allegedly "indicated that Stockholm had complete knowledge that their agent [Larsen] knew the Rumpzas' premises would be unoccupied for as much as 60 days when he issued coverage." This conversation was recorded prior to the August 16, 1993 letter from Stockholm's counsel Ohnstad which claimed Larsen "was led to believe that the house would continue to be occupied by someone."

[¶ 20.] Rumpzas did not become aware of this taped conversation until it was finally disclosed by Stockholm in March of 1997, shortly before the final summary judgment hearing. Rumpzas argue the tape contained information or evidence that was not present when they voluntarily dismissed the counts on November 6, 1996, and thus, they should have been allowed to amend their complaint to reassert the claims.

---

2. Larsen has consistently and adamantly claimed that the property was not "vacant" within the provisions of the policy. At his deposition he testified:

[T]his policy—this is a question of vacancy and occupancy. It was unoccupied. It was not vacant.

So, therefore, since it was my opinion that the property was never vacant, why should I be concerned with the vacancy endorsement if there is such under the policy? I never considered the property vacant according to the information I received from the Rumpzas.

3. SDCL 58–12–3 provides in part:

In all actions or proceedings hereafter commenced against any ... insurance company, ... if it appears from the evidence that such company ... has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause ...,

the trial court and the appellate court, shall, if judgment or an award is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee[.]

SDCL 58–12–3.1 provides in part:

The determination of entitlement to an allowance of attorney fees as costs and the amount thereof under § 58–12–3 shall be made by the court ... at a separate hearing of record *subsequent to the entry of a judgment or award* in favor of the person making claim against the insurance company, and, if an allowance is made, the amount thereof shall be inserted in or added to the judgment or award. Such a hearing shall be afforded upon the request of the claimant made within ten days after entry of the judgment or award.

(Emphasis added). The circuit court ruled on this issue even though SDCL 58–12–3.1 requires the court to hold a separate hearing *after* entry of a judgment.

[¶ 21.] Stockholm maintains that the circuit court's order dismissing the allegation was a "final order" and, therefore, SDCL 15–6–60(b) was the correct standard to apply. We disagree. The circuit court issued a letter opinion on December 20, 1996, and stated that the

> November 1995 summary judgment was entered against Rumpzas on the . . . negligence claim; this Court never reached the issues presented by the· . . . willful and vexatious refusal to pay claim; the November 1995 summary judgment has no bearing on Rumpzas' current motion to amend.

[¶ 22.] SDCL 15–6–60(b) provides in part: On motion and upon such terms as are just, the court may relieve a party or his legal representative from a *final judgment, order, or proceeding* for the following reasons:

(1) Mistake, inadvertence, surprise, or excusable neglect;

(2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under § 15–6–59(b);

(3) *Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;*

. . .

(6) Any other reason justifying relief from the operation of the judgment[.]

(Emphasis added).

[¶ 23.] Rumpzas contend the dismissal of the count was not a "final order" as required under SDCL 15–6–60(b), and therefore SDCL 15–6–15(a) should apply. A "party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." SDCL 15–6–15(a). Under either standard, we will disturb the lower court's finding only upon a showing that the decision was a "clear abuse of discretion." *Hrachovec v. Kaarup*, 516 N.W.2d 309 (S.D. 1994); *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419 (S.D.1994).

[¶ 24.] The circuit court should have considered Rumpzas' motion to amend their complaint to claim willful and vexatious refusal to pay under SDCL 15–6–15(a). The order previously dismissing the count with prejudice was not a "final order" as contemplated by SDCL 15–6–60(b).[4] *All Nation Ins. Co. v. Brown*, 363 N.W.2d 216, 217 (S.D. 1985). We find there is sufficient basis per SDCL 15–6–15(a) upon which the complaint should have been amended.

[¶ 25.] **3. Whether the circuit court erred in not allowing the Rumpzas to amend their complaint and reassert the bad faith claim.**

[¶ 26.] Rumpzas concede that prior to the deposition of Stengel and the subsequent release of the tape in March, 1997, they did not have facts indicating that Stockholm had "an absence of a reasonable basis for a denial" of their claim. *Julson v. Federated Mut. Ins. Co.*, 1997 SD 43, ¶ 6, 562 N.W.2d 117 (citations omitted). After Stockholm admitted the company relied upon the agent's determination as to vacancy and disclosed the tape in which Larsen stated that he did not consider the property vacant, a question of fact was created. The taped interview with Larsen was the first tangible evidence Rumpzas obtained indicating that Stockholm had knowledge of Larsen's initial determination that the house was not vacant. Rumpzas were not aware that Stockholm relied on the agent in determining vacancy when the suit was initiated. The policy makes no mention of this procedure. This knowledge was obtained well after the suit was brought and creates a question of material fact as to whether Stockholm's denial of the claim, through the August 17, 1993 letter to Rumpzas' counsel stating that Larsen "believed the house would continue to be occupied by someone," lacked a reasonable basis.

[¶ 27.] The Supreme Court of North Dakota addressed a situation where an insured was presented with information, after receiving a partial payment on a claim, that the amount of the loss could be greater. *Corwin*

4. Even if it were proper to decide the matter under SDCL 15–6–60(b), Rumpzas would satisfy its mandate. Viewed most favorably to Rump-zas, the tape provides sufficient evidence of misrepresentation so as to fall within the purview of SDCL 15–6–60(b)(3).

*Chrysler–Plymouth, Inc. v. Westchester Fire Ins. Co.,* 279 N.W.2d 638 (N.D.1979). In affirming the bad faith claim, the court found "most significant" the insurer's persistent refusal to pay the balance of its insured's claim after becoming aware that it was liable for the loss. *Id.* at 644. Similarly, viewing the evidence in favor of Rumpzas, there is ample evidence that Stockholm delegated its authority to determine vacancy to Larsen who did not believe the property would be vacant. Even so, Stockholm refused to pay the entire claim. Whether or not this constitutes bad faith is left to the trier of fact. We merely hold there is ample evidence to amend the complaint to include the claim.

### [¶ 28.] 4. Whether the circuit court erred in failing to remove attorney John Ohnstad as counsel for Stockholm.

[¶ 29.] As sufficient evidence exists for Rumpzas to amend their complaint to include bad faith and willful and vexatious refusal to pay claims, we must examine the issue of whether the trial court should remove Ohnstad, Stockholm's attorney, as counsel. The trial court did not rule on the motion to remove Ohnstad because it refused to allow Rumpzas to reassert these claims and granted Stockholm's motion for summary judgment. It is unnecessary for us to decide the issue of disqualification on the merits, but we provide relevant considerations for the circuit court as this case is being remanded.

[¶ 30.] SDCL 19–1–3 governs the disposition of this issue and provides in part:

> When an attorney is a witness for his client upon any trial except as to merely formal matters such as the attestation or custody of an instrument or the like, he shall not further participate in such trial. This section shall not apply when such attorney's testimony is offered in answer to evidence received on behalf of the other party and it shall appear to the satisfaction of the court that such attorney had no reason to anticipate the necessity of his being a witness[.]

"Excluding such testimony avoids potential conflicts of interest." *Ward v. Lange,* 1996 SD 113, ¶ 27, 553 N.W.2d 246, 253 (citation omitted). If not removed, Ohnstad could not be called as a witness because he has a direct interest in the outcome of the case. The statute is clear—"counsel cannot testify for a client on a contested issue and continue to represent such client." *Id.* (citation omitted). This Court's policy is quite explicit on this point:

> [W]e are hereby making it incumbent upon the judges of the circuit court of this state to enforce this provision [SDCL 19–1–3]. Henceforth, if an attorney testifies for his client as to contested matters, neither he nor any member of his firm will be allowed to represent that client at any further proceedings directly relating to that case. If for some reason the attorney does continue to represent the client after becoming a witness, his testimony will be considered incompetent and stricken from the record.

*Id.* 1996 SD 113 at ¶ 28, 553 N.W.2d at 253 (citation omitted).

[¶ 31.] Stockholm seeks to construe SDCL 19–1–3 strictly, arguing that the prohibition is limited to that of a "trial" and here no jury has been seated. It argues that Ohnstad could testify and still be its attorney at all discovery and pre-trial proceedings and the disqualification issue would not present itself until the jury was impaneled. While definitions of a trial vary with the context in which they are used, such a definition as advocated by Stockholm would make little sense when examined against the purposes for the rule in the first place.

> A violation of this prohibition can result in serious consequences for the attorney and his unfortunate client. It can result in the disqualification of the attorney from further participation in the case. In the alternative, the attorney's testimony is considered incompetent and is stricken from the record . . . . Further, the attorney may inadvertently attack his own client's credibility by testifying in a manner which conflicts with the client's testimony . . . . Thus, it becomes a matter of evidence and not simply a matter of ethics. As a violation of Rule 3.7 of the attorney's required professional conduct, ethics is also involved and a violation may result in an unwanted appearance before the grievance committee.

*Estes v. Millea,* 464 N.W.2d 616, 619 n. 4 (S.D.1990) (citations omitted). Our holding in *Ward* that "[t]he roles of an advocate and a witness are totally inconsistent and [the attorney cannot] assume both roles at the same time," has the same force and logic to proceedings preparatory to the actual jury trial. 1996 SD 113 at ¶ 27, 553 N.W.2d at 253. We hold that SDCL 19–1–4 mandates disqualification at any time during the proceedings where the attorney testifies and does not come within one of the recognized exceptions of the statute.

[¶ 32.] Obviously, involuntary disqualification of counsel is a serious step which has great potential for disruption to the client's case and is cause for concern over abuse of the judicial system. Thus, if the disqualification is sought by the opposing party, it should only be done upon a showing by the moving party that:

(1) no other means exist to obtain the information than to depose opposing counsel;

(2) the information sought is relevant and nonprivileged; and

(3) the information is crucial to the preparation of the case.

*Harter v. Plains Ins. Co.,* 1998 SD 59, ¶ 22, 579 N.W.2d 625, (citing *Cascone v. Niles Home for Children,* 897 F.Supp. 1263, 1265 (W.D.Mo.1995) (relying upon *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir.1986))).

[¶ 33.] Rumpzas amended complaint should be allowed to include allegations of willful and vexatious refusal to pay and bad faith. Stengel has admitted that Ohnstad was intimately involved in the claims process which provide the basis for these claims. Rumpzas allege that Ohnstad "may be the only witness available to explain Stockholm's denial of benefits given his involvement with interviewing Larsen prior to Ohnstad's letter on behalf of Stockholm to the Rumpzas." The tape recorded interview indicates that Larsen did not believe the house would be vacant and was appraised by Rumpzas of the occupancy status of the home. Ohnstad, however, authored the subsequent July 14, 1993, letter to Rumpzas stating that Larsen believed the house would continue to be occupied when the policy was first issued.

[¶ 34.] It is clear that Ohnstad's testimony would be sought on the contested issue of whether Stockholm's basis for denial of the claim was reasonable. Upon remand, the trial court should conduct a hearing to determine if disqualification is justified in a case such as this where the attorney's conduct went beyond that of giving legal advice and participated directly in the claims process.

[¶ 35.] **5. Whether the vacancy endorsement attached to the Rumpzas' policy was invalidated by SDCL 58–10–10.**

[¶ 36.] Donalar argues the vacancy endorsement included in Rumpzas' policy should be void in light of SDCL 58–10–10 which provides in part:

Whenever any policy of insurance is written or renewed to insure any real property in this state, including structures on land owned by a person other than the insured, against loss by fire, tornado or lightning and the property insured is wholly destroyed, without criminal fault on the part of the insured or his assigns, the amount of insurance written in the policy shall be taken conclusively to be the true value of the property insured and the true amount of loss and measure of damages, with the following conditions:

(1) This section applies only if a total fire loss occurs ninety days or more after the policy was made or written or ninety days or more after the policy limits were increased by twenty-five percent or more at the insured's request. However, within the first ninety days, payment to the insured shall be in accordance with the terms and conditions of the policy for valuation of the property absent stated amount;

(2) Subdivision (1) of this section does not apply to unchanged renewal policies, to policies with inflation adjustment limits or to policies which are being converted to replacement cost coverage from a lesser value form and upon which there is a written agreement between the company and the insured that the policy will be written on a valued basis[.]

[¶ 37.] The circuit court held that SDCL 58–10–10, commonly referred to as a valued policy statute, did not apply to Rumpzas' policy because it furthered no public purpose and because the loss occurred within ninety days of the placement of coverage. It is undisputed that the loss occurred prior to the expiration of ninety days of the inception of coverage of the South Shore property. Donalar submits the addition of coverage for the South Shore property on April 1, 1993, was a modification of an existing policy and did not create a new contract for insurance under SDCL 58–10–10(1). Donalar's argument is not persuasive. April 3, 1993, was the first opportunity for Stockholm to value the South Shore property; a new risk. We read statutes as a whole and effect must be given to all its provisions. *Beitelspacher v. Winther*, 447 N.W.2d 347, 351 (S.D.1989); *Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292, 295 (S.D.1982); *State v. Heisinger*, 252 N.W.2d 899, 903 (S.D.1977). SDCL 58–10–10 begins by stating, "[w]henever any policy of insurance is written or renewed to insure any real property[.]" The South Shore property was "written" for the first time on April 3, 1993. Therefore, for purposes of the valued policy statute, a new policy is formed with respect to the added property when the insured first procures insurance on real property not covered under a previous policy between the insured and the insurance company.

[¶ 38.] Donalar next argues the Rumpzas' policy insuring the South Shore property was a policy "being converted to replacement cost coverage from a lesser value form" and therefore SDCL 58–10–10(2) applies as an exception to the exception of subsection (1). *Id.* This argument is easily disposed of as Donalar fails to demonstrate the existence of a "written agreement" between the insured and Stockholm indicating the policy was to be written on a value basis as required under SDCL 58–10–10(2). We affirm the portion of the circuit court's order refusing to invalidate the Rumpzas' policy based upon the valued policy statute.

### Conclusion

[¶ 39.] We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

[¶ 40.] MILLER, C.J., and KONENKAMP, J., concur.

[¶ 41.] AMUNDSON, J., and DOBBERPUHL, Circuit Judge, dissent.

[¶ 42.] DOBBERPUHL, Circuit Judge, sitting for SABERS, Justice, disqualified.

DOBBERPUHL, Circuit Judge (dissenting).

[¶ 43.] I disagree with the majority decision on issue one. The majority found the insurance contract ambiguous because it failed to contain a term that defines and determines vacant property. The endorsement clearly defines vacant property as "not lived in; void of furnishing; or furnished, but not used as a full-time primary residence." It further states that the insurance will not cover a loss if the property is vacant beyond thirty days. This clearly states that the insurance company determines that property is vacant if one of the three events occurs for more than thirty days.

[¶ 44.] The Rumpzas are not contending that the vacancy endorsement can be interpreted different ways, but believe the endorsement is ambiguous because the insured does not know whether or not his/her property is deemed vacant thus requiring an increased premium for full coverage. No party is disputing that the agent determines whether or not the property is deemed vacant when he/she underwrites the policy and that his/her determination is made according to the definition in the endorsement. Stockholm's president stated that the insured does not know whether or not his property is deemed vacant and whether or not he is paying higher premiums to receive full coverage unless the agent informs him. This creates a duty on the agent, and breach of that duty gives the insured a right to recover under a negligence action which the Rumpzas have pursued and which is a separate and viable claim despite this appeal. The Rumpzas' lack of knowledge as to whether their property was deemed vacant or not and whether they were paying an increased premium does not make the contract ambiguous.

The insurance contract and the endorsement are subject to only one interpretation, and therefore are unambiguous.

[¶ 45.] The majority found that summary judgment was not appropriate because a question of material fact exists as to the breach of contract because the insurance company's agent, Larson, did not consider the property vacant when he issued the policy and believed he procured full coverage for the Rumpzas. The agent's belief as to the status of the property at the time he issued the policy is not controlling at the time of the loss. The facts are not in dispute that at the time the policy was issued, the former owners were residing at the premises, and the Rumpzas were planning to make some repairs and rent the premises out. After the fire, investigators determined that the house had not been lived in for more than thirty days. According to the clear language of the endorsement, the property was vacant and it became that way after the contract was issued. In determining whether the contract was breached, the court should look at whether the premises were correctly deemed vacant when the alleged injury occurred and not when the policy was issued. Therefore, the agent's belief at the time he issued the policy is not a material fact.

[¶ 46.] The facts are not in dispute that the Rumpzas did not pay an increased premium and could not have received permission because the agent never believed the premises were vacant. The amendatory endorsement clearly explains that if the premises are vacant beyond thirty days, Stockholm will not pay for the loss, but if permission was granted for the vacancy, the insured will receive sixty percent of the property's value. If the insured pays an increased premium, they will receive the full value of their loss. According to this endorsement, Stockholm did not have to cover the loss. However, Stockholm gave the Rumpzas the benefit of the doubt and found that they had been granted implied permission due to the agent's knowledge of possible vacancy when he issued the policy.[5] It is undisputed that the Rumpzas did not pay an increased premium, and therefore, they were only entitled to sixty percent of the value of the premises which they received. Finding the policy unambiguous and no material facts in dispute, I can find no breach of contract by the insurance company. Therefore, I would affirm the trial court's granting of Stockholm's summary judgment.

[¶ 47.] I am hereby authorized to state that AMUNDSON, J., joins this dissent.

---

5. The agent knew that the Rumpzas were going to make some repairs to the home and rent it out until a purchaser was found. When questioned, the agent believed that depending on the type of repairs, a home could be unoccupied for up to sixty days. The agent was never told what type of remodeling was going to be done or that the home would be unoccupied for more than thirty days. Therefore, I do not believe that this could be considered knowledge of a vacancy.