1999 SD 10

Richard J. CAMPION, Joe Kirby, Tom Kirby, W. Ray Laird, III, Peter M. Mies, Richard Ogle, Martin F. Peterfeit, Ernest M.Sifrar, Marie G. Sifrar, Charles L. Tracer, and Robert Witt, Plaintiffs and Appellees,

v.

PARKVIEW APARTMENTS, a limited partnership, and Brutger Equities,Inc., Successor in Interest to Brutger Companies, Inc., Defendants and Appellants,

and

The South Dakota Housing Development Authority, Defendant.

No. 20393.

Supreme Court of South Dakota.

Argued Sept. 15, 1998.

Decided Jan. 27, 1999.

Joseph M. Butler of Bangs, McCullen, Butler, Foye and Simmons, L.L.P., Rapid City, for plaintiffs and appellees.

Michael A. Hauck of Quaintance, Hauck & Mullen, P.C., Sioux Falls, John A. Pecchia, Christoffel, Elliott & Albrecht, P.A., St. Paul, Minnesota, for defendants and appellants.

SABERS, Justice.

[¶ 1.] General Partner appeals a summary judgment ordering it to enroll the Limited Partnership in a new South Dakota Housing Development Authority plan which increases the amount of income available for distribution by redefining equity. We affirm.

## FACTS

[¶ 2.] Parkview Limited Partnership (Limited Partnership) was formed in 1979 and consists of ten limited partners (Limited Partners) and one general partner, Brutger Equities, Inc. (General Partner). The Limited Partnership's purpose was to build, own, and operate a low-income housing unit (Project) in Madison, South Dakota. The parties entered into a limited partnership agreement (LPA) which provides for dissolution on December 31, 2020.

[¶ 3.] The Project was financed through the South Dakota Housing Development Authority (SDHDA). Part of the financing agreement with SDHDA required the Limited Partnership to enter into a Regulatory Agreement which limits the amount of income available for distribution to Limited Partners and General Partner. Initially the distributions were limited to 6% of the initial equity investment, which was defined by the Regulatory Agreement as the difference between the cost of the Project and the original mortgage. In 1990 SDHDA amended its regulations and increased the amount to 8%. General Partner did not oppose the 1990 increase.

[¶ 4.] The Regulatory Agreement also requires the Limited Partnership to deposit undistributed income into a Residual Receipts Reserve established and maintained by SDHDA. After the 1994 deposit, the balance in the Residual Receipts Reserve was $353,943.

[¶ 5.] The SDHDA mortgage will be repaid on July 1, 2020, and the SDHDA regulations will no longer apply.

[¶ 6.] The LPA provides for allocation of income, profits, and excess net cash receipts of 98% to Limited Partners and 2% to General Partner. For fiscal years 1991, 1992, 1993, and 1994, $7,607 was distributed according to those percentages.

[¶ 7.] In 1992, SDHDA again amended its regulations to offer an optional Redefined Equity Program (REP) which increases the allowed distributions by redefining the equity and increasing distributions to 10% of the redefined equity. Equity is redefined as the excess value of the Project over the then current loan balance.* Under the REP, allowed distributions for 1991 would have increased from $7,607 to $57,460. Enrollment in the REP would require using part of the Residual Receipt Reserve to fund the distributions.

[¶ 8.] General Partner opposed Limited Partners' request to enroll in the REP. It refused to enroll unless Limited Partners

---

* Changes were made because many low-income housing projects were being sold and the mortgages with SDHDA repaid in order to convert the projects to conventional housing, thereby substantially diminishing the number of low-income housing units available.

agreed to change the LPA to increase General Partner's share of the distributions from 2% to 30% until Limited Partners receive their capital contributions, and then profits, gains, losses, and distributions would be divided equally.

[¶ 9.] General Partner claims that enrollment in the REP would deplete the Residual Receipt Reserve which it claims will be distributed equally between General Partner and Limited Partners at the expiration of the term or when the Limited Partnership is sold.

[¶ 10.] On December 12, 1994, Limited Partners filed a complaint seeking an order compelling General Partner to enroll in the REP. Amended complaints, filed on July 29, 1996 and August 12, 1996, added claims of breach of fiduciary duty and gross negligence and sought to have General Partner judicially ousted from the Limited Partnership.

[¶ 11.] Both parties sought summary judgment and stipulated that no genuine issue of material fact existed.

[¶ 12.] The trial court issued a memorandum decision on January 14, 1997 granting summary judgment for Limited Partners. The trial court stated that under the LPA § 2.6, the Residual Receipts Reserve is included in the definition of "Excess Net Cash Receipts" and would be distributed 98% to Limited Partners and 2% to General Partner if not for the SDHDA regulation. Therefore, the trial court reasoned that when the SDHDA regulation is lifted on July 1, 2020 (when the mortgage is repaid), the Residual Receipts Reserve is permitted to be distributed according to the $\frac{98}{2}\%$ scheme. The trial court found that § 12.3 of the LPA, regarding liquidation, did not apply because this was not a sale, exchange, or refinancing of all or substantially all of the assets of the Limited Partnership. Finding a breach of fiduciary duties by refusing to enroll in the REP, the trial court ordered the removal of General Partner.

[¶ 13.] The parties entered a stipulation withdrawing Limited Partners' allegations of breach of fiduciary duty and providing that General Partner may remain as long as it enrolls in the REP. This stipulation is contingent upon whether the granting of summary judgment is affirmed on appeal.

[¶ 14.] Several sections of the LPA and the Regulatory Agreement are key to discussion of this case:

[¶ 15.] Section 2.6 of the LPA states:

> **"Excess Net Cash Receipts"** of the Partnership means the net income of the Partnership for the fiscal year computed on the cash receipts and disbursements method consistently applied, plus the amount of any deduction for depreciation or amortization taken in such fiscal year and less the amount paid in such fiscal year on the principal of any mortgage or other encumbrance against the properties of the Partnership and less the amount of any reasonable reserve as determined by the General Partner as of the close of such fiscal year for working capital of the Partnership and/or for repair, replacement or improvement of the properties of the Partnership, plus any net proceeds from the sale of any part, but not substantially all, of the Project, **plus any amount permitted to be distributed to the Partners from** the Development Cost Escrow or **any reserve.** Proceeds from the refinancing of the Project and net proceeds from the sale, exchange or other disposition of substantially all the Project shall not be included.

(Emphasis added.)

[¶ 16.] Section 5.1 of LPA states, in pertinent part:

> The allocation of income, profits, gains and losses among the Limited Partners and General Partner shall be as follows:
>
> (a) To the Additional Limited Partners: 98% thereof (9.8% to the holder of each whole Unit that has been issued and is outstanding, with pro-rata interest to the holder of any fractional Unit); and
>
> (b) To the General Partner: 2% thereof.

[¶ 17.] Section 5.4 of the LPA states, in pertinent part:

> A separate Income Account shall be maintained by the Partnership for each Partner. Such Income Account of each Partner shall be credited or debited as the case may be with the amount of the net income of the Partnership for each fiscal year allocated to such Partner pursuant to Section 5.1 and shall be further debited with the amount of any cash distributions made by the Partnership to such Partner....

[¶ 18.] Section 5.5(a) of the LPA states, in pertinent part:

> All distributions shall be made from the Operating Receipts and Expense Account pursuant to Section 10 of the Regulatory Agreement....  [T]he Partnership shall distribute to the Partners, in the same ratio as such Partners shared in the allocation of the net income of the Partnership for such fiscal year pursuant to Section 5.1, **the Excess Net Cash Receipts** of the Partnership....  [T]he General Partner may determine, in its absolute discretion, to make advance distributions to the Partners of the Excess Net Cash Receipts of the Partnership for the fiscal year to which the Partners will be entitled for such fiscal year....

(Emphasis added.)

[¶ 19.] Section 5.5(b) of the LPA states: "Distribution of any net proceeds upon the sale, exchange, or other disposition or refinancing of all or substantially all of the assets of the Partnership shall be made in accordance with the provisions of Section 12.3."

[¶ 20.] Section 12.3 of the LPA provides for liquidation and winding up of the Limited Partnership. It states, in part:

> If dissolution of the Partnership should be caused by reason of (a) the expiration of the term as set forth in Section 1.5, ... (c) the sale, exchange or other disposition of all or substantially all of the Project ..., the assets and the property of the Partnership shall be distributed in the following order of priority:

> (a) To the payment of all debts and liabilities of the Partnership, other than any loans or advances that may have been made by the Partners to the Partnership, in the order of priority as provided by law;

> (b) To the establishment of any reserves deemed necessary by the General Partner or the person winding up the affairs of the Partnership for any contingent liabilities or obligations of the Partnership;

> (c) To the payment of any loans or advances that may have been made by any of the Partners to the Partnership as pursuant to Section 4.7;

> (d) To the payment of any outstanding Interest Bearing Income Receipts Notes, Residual Receipt Notes and Project Notes;

> (e) To the Limited Partners, to the extent of any credit balance in their respective Income Accounts prior to and not including the allocation of any gain or income from the sale, exchange or other disposition of all or substantially all of the Project;

> (f) To the Limited Partners to the extent of their cash contributions to the capital of the Partnership less any amounts received by the Limited Partners from any distribution from the Development Cost Escrow and less any amounts received by the Limited Partners from the proceeds of any refinancing;

> (g) To the General Partner, to the extent of any credit balance in its Income Account prior to and not including any allocation of any gain or income from the sale, exchange or other disposition of all or substantially all of the Project;

> (h) To the General Partner to the extent of any credit balance in its Capital Account; and

> (i) To the extent of any balance remaining, fifty percent (50%) to the Limited Partners; fifty percent (50%) thereof to the General Partner.

[¶ 21.] Section 10(a) of the Regulatory Agreement states:

All such distributions shall be made only as of or after the end of a semi-annual or annual fiscal period and only as permitted by the Act and the laws of the State of South Dakota and the Rules and Regulations of SDHDA[.]

## STANDARD OF REVIEW

[¶ 22.] Our standard of review for summary judgment is well-established:

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Wildeboer v. S.D. Junior Chamber of Comm.,* 1997 SD 33, ¶ 9, 561 N.W.2d 666, 668 (quoting *Lamp v. First Nat'l Bank of Garretson,* 496 N.W.2d 581, 583 (S.D.1993) (citation omitted)).

[¶ 23.] Ordinarily the movant has the burden of proof to clearly show that no genuine issue of material fact exists and that judgment as a matter of law is dictated. *Wildeboer,* 1997 SD 33 at ¶ 10, 561 N.W.2d at 668–69 (citations omitted). In this case, however, both parties stipulated to the absence of any genuine issues of fact so we review de novo the trial court's construction of the LPA. *See Colonial Ins. Co. of Cal. v. Lundquist,* 539 N.W.2d 871, 873 (S.D.1995) (citations omitted). "The construction of a written contract is a question of law." *Id.* (citing *Isaac v. State Farm Mut. Auto. Ins. Co.,* 522 N.W.2d 752, 755 (S.D.1994)).

[¶ 24.] **WHETHER GENERAL PARTNER IS ENTITLED TO 50% OF THE RESIDUAL RECEIPTS RESERVE UPON THE SALE, EXCHANGE, OR REFINANCING OF ALL OR SUBSTANTIALLY ALL OF THE LIMITED PARTNERSHIP ASSETS OR AT THE END OF THE TERM OF THE LIMITED PARTNERSHIP.**

[¶ 25.] This issue requires interpretation of the LPA, which the trial court described as "nearly indecipherable." The Uniform Limited Partnership Act, SDCL 48–7–504, states, in part: "Distributions of cash or other assets of a limited partnership shall be allocated among the partners, and among classes of partners, in the manner provided in writing in the partnership agreement."

The effects and terms of a contract are questions of law to be resolved by the court.... On appeal, this court can read a contract itself without a presumption in favor of the trial court's determination.... The court is to enforce and give effect to the unambiguous language and terms of the contract.... Whether the language of a contract is ambiguous is a question of law for the court.... A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct....

*Production Credit Ass'n v. Wynne,* 474 N.W.2d 735, 740 (S.D.1991) (quoting *Baker v. Wilburn,* 456 N.W.2d 304, 306 (S.D.1990) (citations omitted)).

[¶ 26.] We note from the briefs and our research the dearth of cases addressing this particular issue. Neither side asserts that this absence of case law falls in their favor.

[¶ 27.] According to § 2.6 of the LPA, "Excess Net Cash Receipts" include "any amount permitted to be distributed to the Partners from ... any reserve." We find that the Residual Receipts Reserve is, therefore, included in the definition of Excess Net Cash Receipts. Section 5.1 of the LPA allocates income, profits, gains, and losses 98%

to Limited Partners and 2% to General Partner. Distribution of the Excess Net Cash Receipts pursuant to the allocation in § 5.1 is authorized by § 5.5(a). Therefore, the LPA authorizes distribution to Limited Partners of 98% of the Excess Net Cash Receipts, including the Residual Receipts Reserve.

[¶ 28.] Such distributions are restricted by the Regulatory Agreement executed with SDHDA which limits the amount available for distribution to the partners. Limited Partners would have received 98% of the funds in the Residual Receipts Reserve if not for SDHDA's restrictions. When the mortgage with SDHDA is repaid on July 1, 2020, those restrictions will no longer hinder distributions to the partners, and the Residual Receipt Reserve can be distributed to the partners pursuant to § 5.5(a) of the LPA according to the ratio stated in § 5.1. Therefore, we conclude that Limited Partners will be entitled to distribution of 98% of the Residual Receipt Reserve once the SDHDA regulations are removed by repayment of the mortgage on July 1, 2020.

[¶ 29.] General Partner argues that distributions are only authorized at the end of the fiscal year and that the LPA does not permit distribution of the Residual Receipt Reserve on July 1, 2020. We disagree. According to § 5.5 of the LPA, distributions are made pursuant to § 10 of the Regulatory Agreement which states that distributions shall be made "as of or after the end of a *semi-annual* or annual fiscal period[.]" (Emphasis added.)

[¶ 30.] The prospectus or Private Placement Memorandum (PPM) submitted to Limited Partners by General Partner prior to investing in the partnership provides in § XIV(B):

*Allocation of Profits, Losses and Excess Net Cash Receipts.*

Until such time as all or substantially all of the Project is sold or otherwise disposed of, Partnership income, profits, gains and losses shall be allocated as follows: to the Limited Partners 98% ... and the balance of 2% thereof to the General Partner.

Any Excess Net Cash Receipts, as defined in the Partnership Agreement, from Partnership operations shall be distributed annually, *or more frequently,* to the respective Partners in the ratios stated above.

(Emphasis added.) In addition, § 5.5(a) of the LPA allows General Partner to make advance distributions of the Excess Cash Receipts to the Partners. Clearly distributions are not limited only to the end of the fiscal year and, therefore, we find General Partner's arguments on this point unconvincing.

[¶ 31.] General Partner argues that § 5.5(a) of the LPA does not apply in the year that the partnership term expires and points to §§ 12.1 and 12.3 in support of its argument. We find nothing in the LPA stating that Limited Partners are not entitled to their distributions under § 5.5(a) in the year 2020.

[¶ 32.] General Partner claims it is entitled to 50% of the Residual Receipts Reserve, under § 12.3 of the LPA, upon the sale, exchange, or refinancing of all or substantially all of the assets of the partnership or at the expiration of the term on December 31, 2020. General Partner opposes enrollment in the REP claiming enrollment will diminish the amount it will receive at such time. We interpret § 12.3 as applying only when the partnership dissolves because of sale, exchange, or refinancing of all or substantially all of its assets or at the expiration of the partnership term.

[¶ 33.] Section III of the PPM provides, in part:

In addition to the fees and payments described on the tabular presentation below, the General Partner shall be allocated a 2% interest in the profits, gains, losses and Excess Net Cash Receipts of the Partnership and a 50% interest in the net cash proceeds realized upon the sale, exchange or other disposition of the Project.

Enrollment in the REP does not involve the sale, exchange, or refinancing of all or sub-

stantially all of the assets of the partnership, and, consequently, § 12.3 does not apply.

[¶ 34.] After reviewing the LPA, we find that ambiguities, if any, within the agreement regarding distribution of the Residual Receipts Reserve would be interpreted against the drafter, General Partner. "Ambiguities arising in a contract should be interpreted and construed against the *scrivener.*" *Production Credit Ass'n,* 474 N.W.2d at 740 (quoting Forester v. Weber, 298 N.W.2d 96, 97 (S.D.1980) (citations omitted)). "This is a rule of *construction* to be applied against one who drafted an ambiguous contract." *Production Credit Ass'n,* 474 N.W.2d at 740 (citations omitted). General Partner proposed this limited partnership and presented the LPA to Limited Partners. General Partner also prepared the prospectus or PPM. These documents became the basis of the bargain. "Any doubts arising from an ambiguity of language in a contract should be resolved against the speaker or writer, because he can, by exactness of expression, more easily prevent mistakes in meaning than the one with whom he is dealing." *Id.* (citations omitted).

[¶ 35.] General Partner bore the responsibility for preventing any possible ambiguities. *Ahlers Bldg. Supply, Inc. v. Larsen,* 535 N.W.2d 431, 434 (S.D.1995) (citations omitted). We agree with the trial court's observation that one would expect a matter of such importance, such as distribution of significant funds, to be clearly spelled out. Unfortunately it is not. Having construed any ambiguities against the drafter, General Partner, we find that General Partner is not entitled to 50% of the Residual Receipts Reserve because the SDHDA restrictions on distribution to the partners will be removed on July 1, 2020. At such time, the Residual Receipts Reserve will be available for distribution, 98% to Limited Partners and 2% to General Partner, as Excess Net Cash Receipts. Section 12.3 of the LPA does not govern this distribution because enrollment in the REP does not constitute a sale, exchange, or refinancing of all or substantially all of the Limited Partnership's assets.

[¶ 36.] Affirmed.

[¶ 37.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.