2000 SD 98

**Dorothy OVERFIELD, Plaintiff and Appellant,**

v.

**AMERICAN UNDERWRITERS LIFE INSURANCE COMPANY, Defendant and Appellee.**

No. 21211.

Supreme Court of South Dakota.

Considered on Briefs May 30, 2000.

Decided July 26, 2000.

Dennis C. McFarland of McFarland and Weidenaar, Sioux Falls, Attorney for plaintiff and appellant.

Donald A. Porter of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, Attorneys for defendant and appellee.

[¶ 1.] **Justice Robert A. Amundson delivers the opinion as to the result of the decision of the Court.**

[¶ 2.] **Justice Richard W. Sabers delivers the opinion as to the rationale of the decision of the Court.**

AMUNDSON, Justice.

[¶ 3.] Dorothy Overfield (Dorothy) appeals the trial court's refusal to give her proposed jury instructions regarding ambiguity. We affirm.

**FACTS**

[¶ 4.] Craig Overfield (Craig) was employed by the City of Sioux Falls, South Dakota (City) as superintendent of the light department. On September 13, 1994, as part of his upcoming retirement, Craig was required by his retirement package with City to undergo an extensive physical. Craig had suffered from high blood pressure since the early 1970's and had been taking blood pressure medication. The physical examination revealed that Craig

had an abnormal electrocardiogram and he was thereafter referred to a cardiologist.

[¶ 5.] On or around September 21, 1994, Dr. Richard Backes, a cardiologist, performed a stress test on Craig and discovered that Craig was suffering from a heart condition. Craig was diagnosed with reduced blood flow to his heart due to a 20 to 40 percent blockage. As a result of the diagnosis, Craig was informed. by Dr. Backes that he was at a high risk of sudden death. Dr. Backes further advised Craig that his treatment options included: (1) medical therapy and life-style changes; (2) to undergo an angioplasty, which is a balloon-type procedure to open up an artery; or (3) to undergo bypass surgery. Dr. Backes suggested medical therapy and life-style changes. Craig followed Dr. Backes' suggestion and was placed on medication and encouraged to improve his diet and discontinue smoking.[1] Craig was not told to limit his recreational activities, such as hunting and fishing. Craig was also not scheduled for any follow-up appointments for his heart condition.

[¶ 6.] In February 1995 Craig decided to purchase a new pickup. Craig financed the purchase of the pickup through the Sioux Empire Federal Credit Union (Credit Union). In addition to the loan agreement with Credit Union, Craig elected to purchase a credit term life insurance policy in the amount of the loan.

[¶ 7.] The credit term life insurance policy was issued through American Underwriters Life Insurance Company (American). The policy application contained a Disclosure Statement with the provision "I must be under age 65 and I must not be disabled or must not be under the care of a physician for any injury or sickness." Craig signed the application on February 8, 1995 and paid a premium of $545.03.

[¶ 8.] In June of 1995 Craig's heart condition deteriorated. Craig eventually developed ischemic heart disease and died of sudden death syndrome on August 14, 1995. Craig's wife, Dorothy, made a claim to American for the credit life insurance policy proceeds. American denied the claim and rescinded the contract claiming Craig made a material misrepresentation in his application. American's basis for its denial was the provision in the Disclosure Statement stating "must not be under the care of a physician for any injury or sickness."

[¶ 9.] Dorothy initiated a declaratory judgment action against American to determine whether American was contractually obligated to pay Dorothy the insurance policy proceeds. Dorothy later moved to amend her complaint to add a count of bad faith, bifurcate the issues as to coverage and bad faith, and request a jury trial. The motion to amend the complaint was granted and the trial court allowed the coverage issue to be tried before a jury. The issue raised by Dorothy at trial was that the provision "must not be under the care of a physician for any injury or sickness" was ambiguous and should therefore be interpreted against American, the drafters of the provision. The case was tried to a jury on June 22–23, 1999. At the conclusion of the trial, Dorothy proposed jury instructions eleven through sixteen regarding ambiguity and the effect of ambiguity on a contract.[2] The trial

---

1. Craig was placed on a different blood pressure medication in September 1994 due to his newly diagnosed heart condition.

2. The proposed instructions were as follows:

   [Dorothy's] Proposed Jury Instruction No. 12
   Language in a contract may be said to be ambiguous when it is reasonably capable of being understood in more than one sense.

   [Dorothy's] Proposed Jury Instruction No. 13
   Any doubts arising from ambiguity of language in contracts are to be resolved against the drafter of the contract.

   [Dorothy's] Proposed Jury Instruction No. 14
   The Defendant drafted the language of the policy for Group Credit Insurance, including the Disclosure Statement contained in the application.

   [Dorothy's] Proposed Jury Instruction No. 15
   Where a provision of an insurance policy is fairly susceptible to different interpreta-

court found the application provision was not ambiguous and rejected Dorothy's proposed instructions.[3]

[¶ 10.] The jury ultimately returned a verdict in favor of American. Dorothy now appeals, raising the following issue:

Whether the trial court erred in rejecting Dorothy's proposed jury instructions on ambiguity.

### STANDARD OF REVIEW

[¶ 11.] Our standard of review for the trial court's rejection of a proposed jury instruction is well settled. We have often stated,

On issues supported by competent evidence in the record, the trial court should instruct the jury. The trial court is not required to instruct on issues lacking support in the record. Failure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial. The burden of demonstrating prejudice in failure to give a proposed instruction is on the party contending error.

*Buxcel v. First Fidelity Bank,* 1999 SD 126, ¶ 13, 601 N.W.2d 593, 596 (quoting *Sundt Corp. v. South Dakota Dep't of Transp.,* 1997 SD 91, ¶ 19, 566 N.W.2d 476,

480 (emphasis added) (citing *Kuper v. Lincoln–Union Elec. Co.,* 1996 SD 145, ¶ 32, 557 N.W.2d 748, 758)). This Court has repeatedly stated that " '[a] trial court must present only those instructions to the jury which are supported by competent evidence and set forth the applicable law.' " *Atkins v. Stratmeyer,* 1999 SD 131, ¶ 55, 600 N.W.2d 891, 903 (Amundson, J., dissenting) (quoting *Sundt,* 1997 SD 91, ¶ 22, 566 N.W.2d at 481 (quoting *State v. Johnson,* 320 N.W.2d 142, 147 (S.D.1982))).

[¶ 12.] We have often stated that contract construction is a question of law which we review de novo with " 'no presumption in favor of the trial court's determination.' " *See Fox v. Burden,* 1999 SD 154, ¶ 12, 603 N.W.2d 916, 920 (quotation omitted); *Chord v. Reynolds,* 1999 SD 1, ¶ 13, 587 N.W.2d 729, 732. Further, " '[w]hether the language of a contract is ambiguous is [also] a question of law for the court.' " *Campion v. Parkview Apartments,* 1999 SD 10, ¶ 25, 588 N.W.2d 897, 902 (quoting *Production Credit Ass'n v. Wynne,* 474 N.W.2d 735, 740 (S.D.1991) (quoting *Baker v. Wilburn,* 456 N.W.2d 304, 306 (S.D.1990) (citations omitted))).

### DECISION

[¶ 13.] **Whether the trial court erred in rejecting Dorothy's proposed jury instructions on ambiguity.**

[¶ 14.] This Court has developed "special rules of construction that apply when in-

tions, the interpretation most favorable to the insured should be adopted.
[Dorothy's] Proposed Jury Instruction No. 16
An ambiguous provision in a policy is construed in favor of insurance and against the one who drafted the contract and caused the uncertainty to exist.

3. In denying Dorothy's proposed instructions, the court held:

The Court [in *Alverson v. Northwestern Nat'l Cas. Co.,* 1997 SD 9, 559 N.W.2d 234] went on to hold that the contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct. And then it goes on to define the specific rules of interpretation which apply if a contract is ambiguous and again cites the Rogers case

cited by [American] that an ambiguity is not of itself created simply because the parties differ as to the interpretation of the contract and that an insurance contract must be construed according to the plain and ordinary meaning, and the Court cannot force a construction or create a new contract for the parties.

In this case the language that is at issue is a part of a sentence which states "and must not be under the care of a physician for any injury or sickness." That language is not ambiguous, does not make the contract ambiguous. However, whether or not [Craig] was under the care of a physician is a question of material fact, and that is to be decided by the jury.

terpreting an insurance policy." *Chord,* 1999 SD 1, ¶ 14, 587 N.W.2d at 732 (citing *Olson v. United States Fidelity & Guar. Co.,* 1996 SD 66, ¶ 6, 549 N.W.2d 199, 200).

> Where the provisions of an insurance policy are fairly susceptible of different interpretations, the interpretation most favorable to the insured should be adopted. This rule of liberal construction in favor of the insured and strictly against the insurer applies only where the language of the insurance contract is ambiguous and susceptible of more than one interpretation.... This rule does not mean, however, that the court may seek out a strained or unusual meaning for the benefit of the insured.

*Id.* (quoting *Olson,* 1996 SD 66, ¶ 6, 549 N.W.2d at 200). To apply our liberal construction to an insurance contract, the contract language "must be ambiguous and susceptible to one or more interpretations." *Id.,* ¶ 15, 587 N.W.2d at 732 (citation omitted).

[¶ 15.] We have often held that " '[a] contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct.' " *Alverson,* 1997 SD 9, ¶ 8, 559 N.W.2d at 235 (quoting *City of Watertown v. Dakota, Minnesota & E. R.R. Co.,* 1996 SD 82, ¶ 13, 551 N.W.2d 571, 574 (citations omitted)). Whether an insurance policy contains ambiguity is determined "by reviewing 'the policy as a whole and plain meaning and effect of its words.' " *Chord,* 1999 SD 1, ¶ 15, 587 N.W.2d at 732 (quoting *American Family Mut. Ins. Co. v. Elliot,* 523 N.W.2d 100, 102 (S.D.1994)).

[¶ 16.] Dorothy argues that we must determine whether the application provision "must not be under the care of a physician for any injury or sickness" is ambiguous. We agree, but we must also review the record and determine if "competent evidence" was presented at trial which would support the jury instructions on ambiguity and whether the failure to give those in-

structions was prejudicial. *See Atkins,* 1999 SD 131, ¶ 55, 600 N.W.2d at 903.

[¶ 17.] During cross-examination of Trudy Helsel, the Assistant Vice President in charge of processing claims for Inter–Americas, she testified as follows:

Q. (Attorney for Dorothy): I guess the question I am going to ask you, ma'am, is of all the people in all 17 states [which they write business in] of all different sizes, shapes, description, are you telling this jury that they all interpret that language under the care of a physician for injury or sickness the same way?

. . . .

A. (Helsel): I can't say how everybody interprets the policies, no.

Q. Somebody could interpret that questionnaire—for example, if they have a broken arm sitting right there as being injured probably? I don't know. Are you going to write that risk if he's sitting there saying wrist works fine, break in the arm right here?

. . . .

A. (Helsel): Well, yes, I guess. I mean, when the claim comes in—I mean, if he was totally disabled at the time due to that broken arm and he was filing for a disability claim for it, then no, the policy—

. . . .

Q. All of my questions have to do with credit life. Let's assume that the day he walks in, one day away from having the cast taken off this arm, he stops in the middle of the process and says gee, am I injured or not?

Under the procedure that I understand that you have described, that person, whoever the person is at the credit union, is supposed to say, whoa, wait a minute. You can't sign that. I need to give you this application, and we need to send it to Kansas to find out if they're going to write you. And the person

says gee, the cast is coming off this afternoon. That's still the procedure that you want followed?

A. (Helsel): A broken arm is not a life threatening situation either.

Q. Does your application say life threatening, ma'am?

A. (Helsel): No, it does not.

Q. Is pregnancy an illness or injury?

A. (Helsel): I would say no.

Q. Can it be life threatening?

A. (Helsel): Yes, it can.

Q. So under the language, you could be taking on some horrendous risks that that application or that statement that you make doesn't cover, correct?

A. (Helsel): I would suppose, yes.

Q. At one time Craig had—I think the record would indicate he had a groin injury. And I think you saw the doctor diagnosed continued to work, didn't take time off, probably gave him some pain medicine. I don't know if that happened. Is that the kind of information you want? It certainly isn't life threatening.

A. (Helsel): On the application it would—if he had been treated within the last five years for that and listed on the—

Q. The exhibit, ma'am, says under the care of a physician for sickness or injury.

A. (Helsel): At the time that this was signed, if he's under the care of a physician, then yes.

Q. Even though it's clearly not life threatening, to use your term?

A. (Helsel): Well, it depends on the term, I guess, as far as under the care of and what the condition is.

Q. Boy, I couldn't agree with you more, ma'am. Tell me this. A couple weeks ago I had this terrible itch on my arm. I went to see a doctor, described it—or the physi-cian's assistant said you got in some poison ivy. Have you been out tramping in the brush? I said yes. Reached over in a drawer, took out some pills. I didn't take them, but they were given to me. Something, I guess, to control the itch or whatever. Now, did that doctor give me a prescription? He gave me drugs that I couldn't go to the store and buy.

A. (Helsel): If it was a medication that had to be obtained by a prescription, I guess that's the same as giving you a sample of a prescription.

Q. So if I were medicating for that and taking those pills and I bought a pickup and if I told the person at the credit union that, they would not write the insurance but would—but would instead give me that application? Are you saying that's the way the company works?

A. (Helsel): No.

Q. All right. They would write the insurance, wouldn't they?

. . . .

A. (Helsel): As far as the condition, it's not an ongoing—it's not going to be an ongoing condition. Poison ivy is something that you are going to be treated by the doctor maybe on that day and you will be released once—in a few days when the itching stops. You're not going to be scheduled for six months or a year to come back for a follow-up for that poison ivy. So, no, you would not be considered under the care for that poison ivy condition.

Q. Is that what the exhibit says?

A. (Helsel): No.

Q. But that's what you're getting at. That's what the person is supposed to understand, correct?

A. (Helsel): Well, I guess.

[¶ 18.] We have previously held that "[a]n insurer . . . may be estopped in

reference to the meaning of a particular term in one of its contracts by its own interpretation of that term.'" *Rumpza v. Donalar Enterprises, Inc.,* 1998 SD 79, ¶ 14 581 N.W.2d 517, 521 (quoting Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 21:8 (3dEd. 1996)). In Couch on Insurance, the authors also noted:

> Although the construction of a contract of insurance is a matter for the court, in a proper case the court may take into consideration the construction which the parties themselves have made. Where the parties have, by certain acts of their own, placed a construction upon doubtful terms of a contract of insurance, this construction generally will be adopted by the courts as against them. At least, where language used in a policy is of doubtful meaning, and the issuing company has construed the same, such construction must be considered as very persuasive, especially if it is favorable to the insured.

Couch on Insurance § 21:7 (3dEd. 1995).

■ [¶ 19.] Helsel's testimony reveals that there is no established interpretation for "must be under the care of a physician for any illness or sickness." The testimony clearly establishes uncertainty as to the meaning of that phrase. As we have often stated, "'a party cannot claim benefit of a version of the facts more favorable to his contentions than he gave in his own sworn testimony.'" *See Chord,* 1999 SD 1, ¶ 19, 587 N.W.2d at 733; *Julson v. Federated Mut. Ins. Co.,* 1997 SD 43, ¶ 11, 562 N.W.2d 117, 121. As such, American is bound to Helsel's testimony which supports Dorothy's contention that the phrase is ambiguous and subject to various interpretations. However, finding the same and finding that the record supported the giving of the ambiguity instructions does not end our inquiry, nor does it relieve Dorothy of her burden to show prejudice caused by the trial court's failure to submit her proposed instructions to the jury. *See Buxcel,* 1999 SD 126, ¶ 13, 601 N.W.2d at 596. *See also First Nat'l Bank in Sioux Falls v. Drier,* 1998 SD 1, ¶ 10, 574 N.W.2d 597, 599–60 (citations omitted) (noting that "[t]he burden is on the appellant to show prejudicial error and that, under the evidence presented, the jury might and probably would have returned a different verdict if the proposed instruction had been given").

[¶ 20.] In determining whether Dorothy was prejudiced, we must look at all the instructions. *See Sporleder v. Van Liere,* 1997 SD 110, ¶ 23, 569 N.W.2d 8, 14; *Kuper,* 1996 SD 145, ¶ 32, 557 N.W.2d at 758. At the conclusion of trial, the following instruction was given to the jury, which has not been assigned error on this appeal:

Jury Instruction 13

The issues to be determine[d] by you in this case are these:

First, was the statement that [Craig] was not under the care of a physician for injury or sickness either a misrepresentation, omission, concealment of fact, or an incorrect statement?

If you answer that question in the negative, you then will return a plaintiff's verdict for the amount of damages set for these instructions.

Second, if you answer it in the affirmative, you have a second issue to determine, namely:

Was the statement fraudulent or material to the defendant's acceptance of the risk under the policy, or material to the hazard assumed by the defendant?

If you answer that question in the affirmative, you will return a verdict for the defendant.

Third, if you answer it in the negative, you have a third issue to determine, namely: Would the defendant in good faith either not have issued the insurance policy or not have issued the insurance policy at the same premium rate?

If you answer that question in the affirmative, you will return a verdict for the defendant. If you answer it in the negative to both the second and third issues, you then will return a plaintiff's

verdict for the amount of damages set forth in these instructions.

A review of the record shows that substantial evidence existed to allow the jury to determine the misrepresentation issue. The evidence supporting the jury determination is that in Craig's 1987 and 1989 medical history questionnaires, at a time when he was only on high blood pressure medication, Craig noted that he was "under a doctor's care." Further, in 1989, he noted in the questionnaire that he "had been refused life insurance or asked to pay higher than normal premiums." While the record does not reveal whether Craig had been refused life insurance or required to pay a higher premium, based upon his response in the 1989 questionnaire, Craig was on notice that he was a higher risk insured. In 1994, Craig was diagnosed with a heart condition and was informed that he was at "high risk for sudden death." His diagnosis also indicated that he had had a previous small heart attack. Finally, he was informed of three treatment options; two of which were significant surgical procedures. Clearly, Craig was on notice that his health condition was quite a bit more severe than a broken arm or poison ivy.

[¶ 21.] This Court has previously noted that an insured has the "duty to disclose all facts material to the risk." *See Opperman v. Heritage Mut. Ins. Co.*, 1997 SD 85, ¶ 9, 566 N.W.2d 487, 491 (quoting 43 Am.Jur.2d *Insurance* § 1010 (1982 & 1996 Supp)). Craig's medical condition was not a minor ailment, but a life threatening malady. Based upon Craig's medical history and the close proximity between his diagnosis and purchase of insurance, he should have disclosed his condition on his insurance application. Although the application provision may be ambiguous, substantial evidence existed to allow a jury to find that Craig misrepresented his condition on the insurance application. Dorothy has failed to show that she was prejudiced by the trial court's rejection of her proposed ambiguity jury instructions.

[¶ 22.] We affirm.

[¶ 23.] MILLER, Chief Justice, and SABERS, KONENKAMP and GILBERTSON, Justices, concur in result.

SABERS, Justice concurring in result and delivering the opinion as to the rationale of the decision of the Court.

[¶ 24.] I agree with the trial court that under the circumstances of purchasing credit life insurance, the policy language was *not* ambiguous. As stated, Craig's medical condition was not a minor ailment, but a life threatening condition. He was at "high risk of sudden death" and under the language of the policy, should have disclosed his condition.

[¶ 25.] Therefore, I concur in result.

[¶ 26.] If this court were to conclude that the language was ambiguous, then it would be reversible error to refuse to give the proposed jury instructions on ambiguity. *See Buxcel v. First Fidelity Bank*, 1999 SD 126, ¶ 13, 601 N.W.2d 593, 596 (stating "[f]ailure to give a requested instruction that correctly sets forth the law is prejudicial error." (citations omitted)); *Delzer Construction Co. v. SD State Bd. of Transportation*, 275 N.W.2d 352, 355 (SD 1979) (providing that "when there is an ambiguous contract, evidence must be introduced to determine ... the intentions of the parties ... and ... such evidence creates a question of fact, which must be resolved by the jury."). *See also Clements v. Gabriel*, 472 N.W.2d 480, 482–83 (S.D.1991) (holding that the trial court did not err in instructing the jury to construe an ambiguous contract against the draftsman); *Delzer*, 275 N.W.2d at 356–57 (providing that the instruction given, implicitly construing an ambiguous contract against the draftsman, was accurate).

[¶ 27.] KONENKAMP, Justice, joins this concurrence in result.

MILLER, Chief Justice (concurring in result).

[¶ 28.] Although I agree with Justice Sabers' special writing, I cannot join the last paragraph. The language of the credit life policy was not ambiguous, therefore I concur in result.

[¶ 29.] GILBERTSON, Justice, joins this concurrence in result.