2002 SD 106

**Julie BOOMSMA, Steve Boomsma and Erica Boomsma, Plaintiffs and Appellees,**

v.

**DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION, Defendant and Appellant.**

**No. 21901.**

Supreme Court of South Dakota.

Argued March 5, 2002.

Decided Aug. 21, 2002.

Rehearing Denied Oct. 3, 2002.

**240**

Steven Johnson and Matthew T. Tobin of Johnson, Heidepriem, Miner, Marlow and Janklow, Sioux Falls, South Dakota, Attorneys for plaintiffs and appellees.

Brian J. Donahoe and Michael D. Bornitz of Cutler and Donahoe, Sioux Falls, South Dakota, Attorneys for defendant and appellant.

WILBUR, Circuit Judge.

[¶ 1.] Julie and Erica Boomsma sustained injuries while driving through the town of Wolsey, South Dakota. Their car struck a flatbed railway car owned and operated by Dakota, Minnesota and Eastern Railroad Corporation. A jury awarded $1,081,655.28 for total damages resulting from this accident.[1] Dakota, Minnesota and Eastern Railroad appeals. We affirm.

### FACTS

[¶ 2.] Dakota, Minnesota and Eastern Railroad Corporation (DM & E) owns railroad tracks that cross Highway 281/14 through the northern edge of Wolsey, South Dakota. At the intersection, the tracks run east and west and the highway runs north and south.

[¶ 3.] The DM & E railway crossing in question consists of three tracks: a main line, a passing or switching line and, 50 feet to the north, an elevator service line. For northbound vehicular traffic on Highway 281/14, the crossing is marked by a

---

1. The jury awarded $1,059,873.40 for Julie and Steve Boomsma and $21,781.88 for Erica.

traffic sign located 110 ten feet before the tracks indicating that a railroad crossing is ahead. Immediately south of the main line, a crossbuck sign indicating "2 Tracks" is attached to a light pole which supports overhead warning lights. The switching line is located immediately north of the main line. Finally, approximately fifty feet north of the switching line is the track which services the grain elevator (the service line).

[¶ 4.] Conversely, approaching the train crossing from the north heading south, one first sees a crossbuck sign which states "3 Tracks." This crossbuck sign is located immediately north of the service line. After crossing the service line, a southbound traveler sees an overhead flashing light device along with another crossbuck attached to that light pole stating "2 Tracks." This crossbuck is located directly north of the switching line.

[¶ 5.] As established by the above facts, a car traveling north is warned that it is approaching only two tracks when there are actually three tracks. Northbound vehicles receive no indication that a third track exists. Vehicles traveling south are warned of all three tracks.

[¶ 6.] The overhead flashing lights and the crossbuck sign attached to the light poles were installed around 1980 pursuant to federal funding issued on June 27, 1978.

[¶ 7.] On January 26, 1998, at approximately 6:20 p.m., Julie and Erica Boomsma were traveling north on Highway 281/14 through Wolsey. As they approached the railroad crossing, Boomsmas saw no flashing lights to indicate the presence of a train and they saw no one waving a lantern signaling that a train was on the tracks. Because it was dark, they saw no train on the tracks. In fact, they were able to see lights and business signs on the other side of the tracks. Boomsmas crashed into the side of a flatbed railcar

that was stopped on the service line at the railroad crossing. Their car came to rest almost completely·underneath the railcar.

[¶ 8.] Prior to the accident, a DM & E train had approached the Wolsey railroad crossing from the west. The train continued east past the Wolsey railroad crossing to where the main line and service line intersected. Then the train, consisting of two cars, backed onto the service line to hook-up five additional cars. Two of these five cars were flatbed cars. The train then continued in reverse until one of the flatbed cars came to rest on the service line at the railroad crossing in question. Forsstrom, one of the train's conductors, was riding the flatbed through the intersection. He was aware the flashing overhead warning lights were not working. There is a dispute about whether or not Forsstrom got off the train and flagged the intersection. The conductor did not sound the whistle or use flares to mark the train in the crossing.

[¶ 9.] Julie Boomsma, who was employed full time in a Huron bank and was active on the family farm prior to the accident, broke her neck, her right leg and her right ankle. As a result of the accident, Julie required multiple surgeries and was left disabled, unable to participate in many of the activities she once could.

[¶ 10.] Erica, a freshman at Huron University, suffered injuries including a cracked sinus, a concussion and a large contusion on her right side. Erica has since recovered from these injuries.

## ISSUES

[¶ 11.] DM & E appeals the following issues:

Whether state law claims are preempted by federal law in this case.

Whether the trial court erred in instructing the jury.

Whether the trial court properly admitted expert witness testimony.

Whether the trial court erred in denying defendant's request for a mistrial based on SDCL 19–12–10 regarding settlement negotiations.

Whether the trial court erred in allowing evidence of post-accident remedial measures.

Whether the trial court erred in not granting DM & E's motion for a new trial based on cumulative error.

Whether the evidence is sufficient to support the jury's verdict.

## ANALYSIS

### ISSUE ONE

**[¶ 12.]** **Whether Boomsma's state law claims are preempted by federal law in this case.**

**[¶ 13.]** The issue of federal preemption is one of law for the court to decide. *Stanton v. State Farm Fire & Cas. Co.,* 78 F.Supp.2d 1029, 1031 (D.S.D. 1999). DM & E asserts that the trial court erred by failing to correctly state DM & E's duty in this negligence case. DM & E claims that the trial court erred in determining that the service line is a separate grade crossing and that DM & E failed to meet certain obligations regarding that separate crossing.

**[¶ 14.]** Federal statutes and regulations preempt state law under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2. Preemption occurs: (1) when Congress expresses a clear intent to preempt state law; (2) when federal and state or local law conflict; (3) when compliance with both federal and state law is impossible; (4) where federal law contains an implicit barrier to state or local law; (5) when Congress has enacted comprehensive national legislation occupying an entire field; or (6) when state and local laws create an obstacle to the accomplishment of Congressional objectives. *Louisiana Pub. Service Com'n v. F.C.C.,* 476 U.S. 355, 368–369, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

**[¶ 15.]** The ultimate touchstone of statutory preemption is Congressional intent. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). "In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 663–664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In this case, the issue is whether express preemption exists barring Boomsma's negligence claim against DM & E through Congressional enactments such as the Federal Railroad Safety Act (FRSA) and the Highway Safety Act of 1973 (FHSA).

[¶ 16.] Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (1994). The express preemption provision states:

Laws regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106 (1994). After enacting the FRSA, Congress passed the Highway Safety Act of 1973 which created the Federal Railway Highway Crossings Program (Crossings Program). *See generally* 23

U.S.C. § 130 (2000). The Crossings Program made funds readily available for construction projects relating to railroad crossings. *Id.*

[¶ 17.] Further, the Secretary of the Federal Highway Administration (FHWA) set forth regulations to implement the Crossings Program. *See generally* 23 C.F.R. § 646.214 (2002). These regulations address the design and adequacy of railroad crossing warnings. *See generally* 23 C.F.R. § 646.214(b) (2002).

[¶ 18.] Case law sets forth factors for deciding whether federal preemption exists. In *Easterwood*, a man was killed at a grade crossing and his widow brought a negligence action claiming the railroad failed to maintain adequate warning signs at the crossing. The crossings were improved with federal funds. *Easterwood*, 507 U.S. at 661, 113 S.Ct. 1732. There were five crossings. *Id.* at 672, 113 S.Ct. 1732. Four of the crossings were equipped with warning devices, however, the crossing in question had no warning devices installed. This was because the city declined to approve construction of a traffic island necessary for installation of the warning devices; therefore, only motion detection circuitry was in place at that crossing. *Id.* The Court ultimately held that the plaintiff's claim as to adequate warning devices was not preempted because the crossing where the accident occurred was a separate crossing from the other four crossings and federal funds were not used in the installation of warning devices at that crossing. *Id.* at 673, 113 S.Ct. 1732.

[¶ 19.] Moreover, the Eighth Circuit Court of Appeals held that, even if federal funds were used in the installation of warning devices, the devices have to be installed and fully operational for preemption to exist. *St. Louis Southwestern Railway Co. v. Malone Freight Lines*, 39 F.3d 864, 867 (8th Cir.1994). Therefore, in order for preemption to apply, federal funds must be used in the installation of warning devices and the warning devices must be installed and fully operational.[2]

[¶ 20.] Were the three tracks at the Wolsey crossing one crossing or was the elevator service line a separate line? DM & E argues that installation of passive warning devices preceding the railroad tracks on either end of U.S. Highway 281/14 indicate that the Federal Highway Department and the South Dakota Department of Transportation considered the three tracks as one crossing. In addition, DM & E argues that, in the upgrade of the Wolsey Crossing, rubberized mats were installed for all three tracks using federal funds and, therefore, the three tracks should be considered one crossing.

[¶ 21.] Prior to the accident, overhead flashing warning lights paid for with federal funds were present immediately south of the main and switching lines. However, those warning lights were not wired to operate when a train was on the service line. No overhead flashing lights existed immediately south of the service line prior to the accident.

[¶ 22.] Crossbuck signs posted at the crossing suggest the service line is a separate line. For those traveling north on Highway 14, the crossbuck sign indicates

---

2. The court in *Malone Freight* looked at the policy behind this test:

Before preemption, the public is protected by a railroad's state common-law duty of care. After installation of federally mandated warning devices, the public is protected by those devices. A plan to install devices and federal approval of a plan do not protect the public.... [Therefore] a railroad's common-law duty of care must continue until those devices are installed.
*Malone Freight*, 39 F.3d at 867.

there are "2 Tracks" ahead, not "3 Tracks."

[¶ 23.] Finally, Tim Carlson, the manager of signals and real estate for DM & E, testified that "tracks servicing elevators such as the one involved in this case will not be protected by the same set of signs and warning devices if they are fifty feet or more from the nearest track." The service line was fifty feet or more from the switching line and main line. The same set of signs and warning lights did not protect all three tracks. It is clear that the DM & E considered the service line to be independent of the other tracks.

[¶ 24.] It is of no consequence that federal funds were used to put rubberized mats on the service line. The rubber mats do not constitute warning devices. Therefore, the trial court correctly applied the rulings in *Easterwood* and *Malone* to the facts of this case. The trial court properly concluded that federal funds were not used in the installation of adequate warning devices at the crossing where the accident occurred. In addition, the court determined that for the motorist traveling northbound on Highway 281/14, there were no warning devices installed and operational at the service track crossing. DM & E did not meet its burden of proof on the preemption issue. Therefore, the trial court did not err in its determination on this issue.

### Other DM & E Arguments

### Does DM & E have a common law or statutory duty?

[¶ 25.] Since federal law does not apply in this case it is necessary to look to DM & E's common law and statutory duties. Under common law, DM & E owes an ordinary duty of care to the public. *Malone Freight*, 39 F.3d at 867. "[A] railroad is required to take precautions to prevent injury to crossing motorists if a reasonable person in the railroad's position would take such precautions." *Duncan v. Union Pacific R. Co.*, 790 P.2d 595, 598 (Utah Ct.App.1990).

[¶ 26.] DM & E also has a statutory duty under SDCL 49–16A–87, which states:

Each railroad shall construct at all points where its road crosses any public road, good, sufficient, and safe crossings and shall erect at such points, at a sufficient elevation from the road to admit free passage of vehicles of every kind, a sign with large and distinct letters giving notice of the proximity of the road and warning persons of the necessity for looking out for trains.

[¶ 27.] DM & E has both a common law and statutory duty to protect the public. Therefore, the Boomsmas have the right to bring a negligence claim in state court.

[¶ 28.] DM & E further argues that the State of South Dakota or the City of Wolsey are indispensable parties subject to joinder under SDCL 49–16A–89.2 and that Boomsma's claim should be dismissed under SDCL 15–6–19(b) because no claim was made against either public entity within the time prescribed under SDCL 3–21–2. SDCL 49–16A–89.2 suggests that the State of South Dakota did not have a duty under the statute until after the accident occurred.

Any railroad tracks over which an operating train travels which crosses a portion of the state trunk highway system, as defined in chapter 31–4, shall have a crossing alarm or a lighting device, or both, to alert the public of approaching trains and to notify the public of trains crossing the highway. *The crossing alarm or lighting device shall be in place by December 31, 1998.* The Department of Transportation shall decide the method which is most suitable for the protection of the public. The De-

partment of Transportation shall use any federal highway safety funds to pay for the crossing alarms and lighting devices. However, if federal highway safety funds are not available, the railroad owning or operating the tracks is liable for the expenses of the crossing alarm or lighting device. (emphasis added).

*Id.* This accident occurred on January 26, 1998. The State's duty went into effect on December 31, 1998. Therefore, the requirements of this statute were not in effect at the time of the accident and are inapplicable to this case.

## ISSUE TWO

[¶ 29.] **Whether the trial court erred in instructing the jury.**

 [¶ 30.] The standard of review regarding jury instructions, is as follows:

> On issues supported by competent evidence in the record, the trial court should instruct the jury. The trial court is not required to instruct on issues lacking support in the record. Failure to give a requested instruction that correctly sets forth the law is prejudicial error. Jury instructions are reviewed as a whole and are sufficient if they correctly state the law and inform the jury. Error is not reversible unless it is prejudicial. The burden of demonstrating prejudice in failure to give a proposed instruction is on the party contending error.

This Court has repeatedly stated that " '[a] trial court must present only those instructions to the jury which are supported by competent evidence and set forth the applicable law.' "

*Overfield v. American Underwriters*, 2000 SD 98, ¶ 11, 614 N.W.2d 814, 816 (citations omitted).

Visibility Instruction

[¶ 31.] DM & E contends that it was error for the trial court to not include its proposed jury instruction regarding visible and audible notice. DM & E's proposed instruction was based upon SDCL 32–29–4, which states:

> If any person driving a vehicle approaches a railroad grade crossing and a clearly visible or audible signal gives warning of the immediate approach of a railway train or car, he shall bring such vehicle to a complete stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad and may not proceed until he can do so safely. A violation of this section is a Class 2 misdemeanor.

[¶ 32.] The trial court denied DM & E's proposed instruction regarding this statute because, under the facts in this case, the statute does not apply. The plain meaning of SDCL 32–29–4 contemplates that a driver must stop his or her car when "a clearly visible or audible signal gives warning of the immediate approach of a railway train or car[.]" *Id.* In this case there were no visible or audible warning devices present for the northbound Boomsmas at the crossing in question.

 [¶ 33.] The service line was not connected to the overhead warning lights which explains why those lights were not activated. The crossbuck sign attached to the overhead warning lights indicated only two tracks instead of three. The evidence is undisputed that no clearly visible or audible signal indicated the presence of an approaching train on January 26, 1998 at 6:20 p.m.

 [¶ 34.] DM & E's proposed jury instruction also contemplates that Julie and Erica Boomsma were contributorily negligent for not stopping based on the presence of passive warning devices. Con-

tributory negligence is a "breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause." *Starnes v. Stofferahn*, 83 S.D. 424, 432, 160 N.W.2d 421, 426 (1968). The trial court correctly concluded the provisions of SDCL 32–29–4 were not applicable to the facts of this case.

[¶ 35.] In any event, the trial court gave an instruction on contributory negligence. Therefore, looking at the jury instructions as a whole, the trial court accurately set forth the law applicable to this case. *See Overfield*, 2000 SD 98 at ¶ 11, 614 N.W.2d at 816.

### Punitive Damages Instruction and Evidence

[¶ 36.] DM & E also contends that it was error to instruct on punitive damages and to submit the Boomsma's punitive damages claim to the jury. SDCL 21–1–4.1 allows:

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

[¶ 37.] Pursuant to SDCL 21–1–4.1, if the trial court, by clear and convincing evidence, finds that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct by a party, then the issue should be submitted for the jury to decide. *See Kieser v. Southeast Properties*, 1997 SD 87, 566 N.W.2d 833. There is no requirement that the required hearing take place before the trial; it may be held at the close of the evidence. *Id.*

[¶ 38.] DM & E contends that, even though an award for punitive damages was not given, it was prejudicial for the jury to hear evidence regarding DM & E's worth. DM & E claims hearing this evidence caused the jury to award more compensatory damages. DM & E would have this Court presume prejudice any time a trial court allows the issue of punitive damages to be submitted to the jury if the jury fails to award punitive damages. We decline to adopt such a presumption.

[¶ 39.] A hearing was conducted outside the presence of the jury at the close of the evidence in the Boomsma's case to discuss whether or not the issue of punitive damages would be submitted to the jury. The trial court, pursuant to SDCL 21–1–4.1, found sufficient evidence existed for the punitive damage issue to be submitted to the jury. The trial court committed no error in doing so.

[¶ 40.] Further, even if the instruction was given in error, DM & E did not prove the error was prejudicial. The evidence regarding DM & E's worth did not prejudice it so as to require a reversal. The jury did not award punitive damages and there was ample evidence to support the jury's award of compensatory damages.[3]

---

**3.** Evidence demonstrated that Julie Boomsma's damages were as follows:

| | |
|---|---|
| $112,586.32 | Medical Bills |
| $583,541.00 | Economic Loss |
| $ 3,000.00 | Loss of Automobile |
| $ 1,200.00 | Gas and Hotel Bills for Medical Appointments |

## ISSUE THREE

**[¶ 41.] Whether the trial court properly admitted expert witness testimony.**

[¶ 42.] The standard of review for the admission of expert testimony has been stated in *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 6, 552 N.W.2d 801, 805:

> We review questions of the admissibility of an expert witness' testimony under an abuse of discretion standard. We have long acknowledged that the trial court has broad discretion concerning the admission of expert testimony. The trial court's decision on such matters will not be reversed absent a clear showing of an abuse of discretion. (citations omitted).

### Dr. Abrams' Expert Qualifications

[¶ 43.] SDCL 19–15–2 governs the admissibility of expert testimony. The test was originally set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and adopted by South Dakota in *State v. Hofer,* 512 N.W.2d 482, 484 (S.D.1994):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. (quoting Federal Rule of Evidence 702).

*See also* SDCL 19–15–2. According to this test, the trial judge must determine " 'that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *In re Dokken,* 2000 SD 9, ¶ 40, 604 N.W.2d 487, 498 (2000) (quoting *State v. Moeller,* 1996 SD 60, ¶ 52, 548 N.W.2d 465, 479). The requirements of the test are satisfied if the expert testimony is relevant and has " 'a reliable basis in the knowledge and experience of his discipline.' " *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

[¶ 44.] Dr. Abrams is a qualified expert. He has an undergraduate degree from Ohio State University with a background in physics, physiology and mathematics. He graduated from the School of Optometry at Ohio State University and has practiced as an optometrist for approximately forty years.

[¶ 45.] Abrams has devoted time to research in the area of vehicular visibility and traffic safety. He has written several articles and has contributed to academic textbooks. More specifically, Abrams has authored chapters entitled "Nighttime Vision and Railroad Crossings," and "Forensic Aspects of Vision and Highway Safety." The list of his qualifications is extensive. Clearly Abrams is an expert qualified to testify.

[¶ 46.] The trial court found Abrams' testimony reliable because his opinions are accepted in the scientific community. Further, the court found that Abrams' testimony was relevant and helpful to the jury as to the issue of contributory negligence and the issue of visibility. Abrams concluded that it would have been difficult for Julie Boomsma to see the train and even more difficult to see the alleged flagman. Abrams visited the scene, took photographs and reviewed reports pertaining to the Boomsma accident.

$700,327.32 TOTAL

This is without including pain and suffering, loss of enjoyment of life, etc.

[¶ 47.] Therefore, Abrams' education and experience accompanied by his review of the accident satisfies the *Daubert* test. The trial court did not abuse its discretion and properly admitted Abram's testimony.

### Dr. Abrams' Professional License

[¶ 48.] DM & E also contends that evidence pertaining to Abrams' optometry license should have been admitted. DM & E contended that Abrams' license was revoked because of Abrams' alleged misconduct. Abrams, however, testified that he voluntarily relinquished his license rather than contest the alleged allegations.

[¶ 49.] The trial court has broad discretion in the admissibility of relevant evidence and, although evidence may be relevant, it is not always admissible. SDCL 19–12–3 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[¶ 50.] The trial court, pursuant to a motion in limine, ordered that any reference to Abrams surrendering his license should be redacted from his taped testimony.[4]

[¶ 51.] While it often constitutes permissible impeachment to cross-examine expert witnesses on issues that reflect on credibility, there are limits. In this case, the court reasoned that it would be more prejudicial than probative to allow testimony which amounted to no more than mere allegations of misconduct. DM & E established no basis for questioning Abrams about these allegations as there was no evidence that Abrams lost his license due to misconduct. Abrams was not charged with or convicted of any crime and no administrative agency made findings of fact or entered conclusions of law regarding misconduct by Abrams.

[¶ 52.] The trial court determined that admitting allegations of misconduct by Abrams into evidence would be highly prejudicial. The trial court did not abuse its discretion in excluding testimony regarding the alleged misconduct.

### CONCLUSION

[¶ 53.] DM & E has raised several other issues. "We need not address [the remaining issues raised by DM & E], as they 'lack sufficient merit or importance to warrant individual attention.' *Mattson v. Rachetto*, 1999 SD 51, ¶ 7 n. 4, 591 N.W.2d 814 n. 4." *Parker v. Casa Del Rey–Rapid City, Inc.* 2002 SD 29, ¶ 27, 641 N.W.2d 112, 122.

[¶ 54.] Affirmed.

[¶ 55.] GILBERTSON, Chief Justice, and SABERS and AMUNDSON, Justices, and GORS, Acting Justice, concur.

[¶ 56.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

[¶ 57.] WILBUR, Circuit Judge, for KONENKAMP, Justice, disqualified.

---

4. Abrams did not testify in person at trial. Instead, the jury saw his videotaped deposition.